Argued and submitted March 14, remanded for reconsideration October 31, 2007

FRIENDS OF THE COLUMBIA GORGE, INC.;
Columbia Riverkeeper; Claudia Curran;
Eric Lichtenthaler; Phil Pizanelli;
Dixie Stevens; Columbia Gorge Hotel Co.;
1000 Friends of Oregon; Jack Mills; Kate Mills;
Brian Winter; and Cynthia Winter,
*Petitioners,*

*v.*

COLUMBIA RIVER GORGE COMMISSION,
*Respondent.*

A125031

171 P3d 942

558-b

Gary K. Kahn argued the cause for petitioners. With him on the briefs were Reeves, Kahn & Hennessy, and Mary Kyle McCurdy and 1000 Friends of Oregon.

Jeffrey B. Litwak argued the cause and submitted the brief for respondent.

Before Landau, Presiding Judge, Brewer, Chief Judge, and Ortega, Judge.

LANDAU, P. J.

**LANDAU, P. J.**

The Columbia River Gorge Commission revised its management plan for the Columbia River Gorge National Scenic Area. Petitioners seek judicial review of those revisions, arguing that the revisions violate federal law in some two dozen different ways. In particular, petitioners contend that the revised management plan is fatally incomplete and that the plan's revisions are contrary to the requirements of the law. In brief, we conclude that the revised management plan is not unlawfully incomplete, but that in one aspect the revised management plan does violate that law. We therefore remand for reconsideration.

## I. BACKGROUND

We begin with an overview of the governing legal framework and the facts leading to this review, leaving to our analysis of particular assignments of error any additional facts that are relevant to those assignments.

A. *The National Scenic Act*

Congress passed the Columbia River Gorge National Scenic Act in 1986. The Act creates the Columbia River Gorge National Scenic Area, which stretches for more than 80 miles along the Columbia River and encompasses nearly 300,000 acres, including parts of six different counties in two different states: Clark, Klickitat, and Skamania counties in Washington; and Hood River, Multnomah, and Wasco counties in Oregon. 16 USC §§ 544(d), 544b. Congress's stated goals in passing the Act are "to protect and provide for the enhancement of the scenic, cultural, recreational, and natural resources" in the gorge and "to protect and support the economy" of the area "by encouraging growth to occur in existing urban areas" and by allowing future economic development in a manner consistent with the goal of protecting the gorge's resources. 16 USC § 544a.

To accomplish those goals, the Act establishes a framework within which a land use management plan is to be developed, implemented, and administered. The Act authorizes Oregon and Washington to enter into an interstate compact and to create a regional commission, which, in

cooperation and consultation with the United States Secretary of Agriculture, would be charged with developing and implementing the land use management plan. 16 USC § 544c.

In laying the groundwork for the development of the management plan, the Act divides the gorge into three kinds of areas. First, the Act designates 13 "urban areas" in the gorge that are not subject to scenic area regulations in the management plan. 16 USC § 544b. Next, the Act expressly designates 115,000 acres of "special management areas" (SMAs), deemed to comprise the most sensitive parts of the scenic area. The SMAs are located primarily, though not exclusively, in the western half of the gorge. *Id.* Finally, the remaining land comprises what the commission has designated as the gorge's "general management areas" (GMAs) and covers approximately 149,000 acres, the majority of which are located in the eastern half of the scenic area. *See id.* (specifying boundaries of management areas).

The Act calls for the commission and the Secretary of Agriculture (who, in turn, delegated the statutory authority to the Forest Service) to develop a regional land use management plan for the GMAs and SMAs in three basic steps. First, the Act calls for the commission and the Secretary to conduct resource inventory, economic opportunity, and recreation assessment studies. 16 USC § 544d(a). Second, based on the results of those studies, the Act calls for the development of land use designations for the scenic area. 16 USC § 544d(b). Those designations, developed by the commission and the Secretary, result in a zoning map for the scenic area, designating allowed uses—*e.g.*, agriculture, commercial, open space, forestry, residential—in different areas. *Id.* Third, the Act calls for the commission and the Secretary to develop a land use management plan for the scenic area, incorporating the land use designations and including specific land use guidelines. 16 USC § 544d(c). The commission is charged with developing designations and guidelines applicable to the GMAs, while the Secretary is charged with developing the designations and guidelines applicable to the SMAs. 16 USC §§ 544d(c), 544f(f).

In developing the management plan, the commission and the Secretary are charged with consulting with federal, state, and local governments and Native American tribes having jurisdiction within the scenic area. 16 USC § 544d(e). They are also charged with conducting public hearings and soliciting public comment before adopting the final management plan. *Id.*

To implement the regional land use management plan, the Act requires that the six counties within the scenic area adopt land use ordinances that are consistent with the plan guidelines. 16 USC § 544e(b). If a county refuses to implement such ordinances, the commission is required to create and administer conforming land use ordinances for the county. 16 USC § 544e(c). Only those counties that enact land use ordinances that are consistent with the guidelines in the land use management plan become eligible for federal economic development grants. 16 USC § 544i(c)(4).

The Act establishes a broad set of standards for the management plan and county ordinances enacted pursuant to it:

"The management plan and all land use ordinances * * * adopted pursuant to this Act shall include provisions to—

"(1)   protect and enhance agricultural lands for agricultural uses and to allow, but not require, conversion of agricultural lands to open space, recreation development or forest lands;

"(2)   protect and enhance forest lands for forest uses and to allow, but not require, conversion of forest lands to agricultural lands, recreation development or open spaces;

"(3)   protect and enhance open spaces;

"(4)   protect and enhance public and private recreation resources and educational and interpretive facilities and opportunities, in accordance with the recreation assessment adopted pursuant to subsection (a) of this section;

"(5)   prohibit major development actions in special management areas, except for partitions or short plats which the Secretary determines are desirable to facilitate land acquisitions pursuant to this Act;

"(6) prohibit industrial development in the scenic area outside urban areas;

"(7) require that commercial development outside urban areas take place without adversely affecting the scenic, cultural, recreation, or natural resources of the scenic area;

"(8) require that residential development outside urban areas take place without adversely affecting the scenic, cultural, recreation, and natural resources of the scenic area; and

"(9) require that the exploration, development and production of mineral resources, and the reclamation of lands thereafter, take place without adversely affecting the scenic, cultural, recreation[,] and natural resources of the scenic area."

16 USC § 544d(d). The Act defines "adversely affect" as

"a reasonable likelihood of more than moderate adverse consequences for the scenic, cultural, recreation[,] or natural resources of the scenic area, the determination of which is based on—

"(1) the context of the proposed action;

"(2) the intensity of a proposed action, including the magnitude and duration of an impact and the likelihood of its occurrence;

"(3) the relationship between a proposed action and other similar actions which are individually insignificant but which may have cumulatively significant impacts; and

"(4) proven mitigation measures which the proponent of an action will implement as part of the proposal to reduce otherwise significant [e]ffects to an insignificant level[.]"

16 USC § 544(a). After development of the management plan, the commission is required to submit the plan to the Secretary of Agriculture, who must concur that its contents are "consistent with the standards established in this section and the purposes of this Act." 16 USC § 544d(f).

After approval and concurrence, the commission must periodically review the management plan. Specifically, the Act provides:

"No sooner than five years after adoption of the management plan, but at least every ten years, the Commission shall review the management plan to determine whether it should be revised. The Commission shall submit any revised management plan to the Secretary for review and concurrence, in accordance with the provisions of this section for adoption of the management plan."

16 USC § 544d(g).

The Act also provides for judicial review of commission decisions and actions. Among other things, it provides that the state courts of Oregon and Washington have jurisdiction to review any final order or action of the commission relating to the implementation of the Act. 16 USC § 544m(b)(6)(C).

Judicial review of "decisions" of the commission in this court is governed by ORS 196.115. Specifically, a "final action or order" of the commission is subject to review on a petition for judicial review of an order in a contested case under the state Administrative Procedures Act, ORS 183.482. ORS 196.115(2)(a). Such a petition for judicial review is subject to the following standards of review:

"(c) The court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, the court shall:

"(A) Set aside or modify the order; or

"(B) Remand the case to the agency for further action under a correct interpretation of the provision of law.

"(d) The court shall remand the order to the agency if the court finds the agency's exercise of discretion to be:

"(A) Outside the range of discretion delegated to the agency by law;

"(B) Inconsistent with an agency rule, an officially stated agency position or a prior agency practice, unless the inconsistency is explained by the agency; or

"(C) Otherwise in violation of a constitutional or statutory provision.

"(e) The court shall set aside or remand the order if the court finds that the order is not supported by substantial evidence in the whole record."

ORS 196.115(3).

## B. *The original management plan*

In 1987, Oregon and Washington adopted the Columbia River Gorge Compact, which created the Columbia River Gorge Commission. ORS 196.150; RCW 43.97.015; *see also* 16 USC § 544c(a)(1)(A) (directing those states to do so). The commission has 13 members: three are appointed by the governor of Washington, three by the governor of Oregon, one by each of the six counties, and one nonvoting member by the Secretary of Agriculture. 16 USC § 544c(a)(1)(C); ORS 196.150; RCW 43.97.015. The commission is funded by appropriations from Oregon and Washington, subject to the limitation that the commission is required to apportion expenditures equally between the two states. The commission also may receive grants from the federal government. ORS 196.150; RCW 43.97.015.

The commission completed the original management plan in 1991, and the Secretary of Agriculture concurred in 1992. As approved, the plan consists of four parts. In Part I are provisions aimed at protecting the scenic, cultural, natural, and recreation resources of the gorge. A chapter is devoted to each of those four resources, each chapter containing policies and specific guidelines applicable to the GMAs and developed by the commission as well as policies and guidelines applicable to the SMAs and developed by the Forest Service. In Part II, the management plan explains the different types of land use designations that apply to the scenic area, with provisions that apply to each of the different designations. The plan includes a map indicating the land use designations for all the land in the scenic area. In Part III are provisions related to recreational and economic development. And Part IV describes the roles of the commission and the Forest Service in administering the plan.

## C. *Revision of the original management plan*

The commission began a process for reviewing the original management plan in the late 1990s, aided by a federal grant. To prepare for that review, between 1997 and 2001, the commission produced a series of monitoring reports, drafted by an interagency team, consisting of staff from the six county planning departments, the Forest Service, and the commission, which studied and evaluated the extent to which the management plan guidelines were working to protect the resources in the scenic area. A number of such monitoring studies were conducted, including reports regarding scenic and cultural resources, as well as a report on agricultural and forest lands.

The review process itself began with a "scoping" phase, in which the commission determined the scope of the issues on which it would work. The commission held public meetings in each of the six counties in the scenic area and solicited input from the public regarding any aspects of the management plan that should be revised. In addition, the commission gathered input from meetings with planners in each of the counties, the Native American tribes in the area, and other local governments. In all, the commission recorded approximately 1,600 written and oral comments during the scoping phase.

Based on the comments it received and the monitoring studies that it had conducted, the commission ultimately created a list of 26 topics to be addressed in its "Plan Review." The commission then held a series of public meetings during which it considered each of those topics. At those meetings, the commission heard staff reports and recommendations and solicited public testimony.

In 2001, however, the federal grant that had been funding the review process ended. Meanwhile, in 2001, the Oregon and Washington legislatures reduced the commission's budget. And, in 2003, the Oregon legislature further reduced the commission's budget, notwithstanding warnings from the legislative fiscal office that the reductions would result in "elimination of the plan review project." In response to its shrinking budget, the commission held public hearings

and reduced the scope of its plan review. The commission further prioritized and reduced the number of issues that it would address. It created a short-term list of topics to be addressed first, and a long-term list of issues to be addressed to the extent that the commission had the resources left to do so.

Ultimately, the commission completed all the items on its short-term list. But it left the majority of the long-term issues unresolved, opting instead to put consideration of those issues on "[h]old for next plan review." In January 2004, the commission completed a draft revised management plan. The draft incorporated changes to the guidelines regarding the SMAs that had been created by the Forest Service. At a final public hearing on April 27, 2004, the commission voted unanimously to adopt the revisions. The revised management plan was transmitted to the Secretary of Agriculture for concurrence. The Secretary concurred on August 3, 2004.

## II. ANALYSIS

Petitioners—residents of the Columbia River Gorge, businesses, and conservation organizations—filed a petition for review of the revised management plan on June 14, 2004. After a lengthy briefing process, the matter was submitted to this court on March 14, 2007.

Petitioners advance some two dozen different assignments of error, categorized in their brief as 13 assignments and a variety of "subassignments" of error. Since the briefing was submitted, we have been informed that petitioners have abandoned some of them, specifically, assignments 2.8, 3.2, 4.2, and 11. As we understand them, those that remain can be grouped into two categories.

First, petitioners contend that the commission's review process was incomplete. According to petitioners, the Act requires the commission to review the entire management plan, not merely select portions of it, and budgetary constraints do not justify the commission's "piecemeal" review process.

Second, petitioners contend that the revised management plan itself violates the requirements of the Act in a

multitude of ways. The violations, they argue, include omissions and failures to take steps required by the Act to protect and enhance scenic, natural, cultural, recreational, and agricultural resources in the scenic area, and authorization of future acts that either could or actually do violate the Act.

The commission responds by asserting that a number of petitioners' contentions are not ripe. The commission notes that several of petitioners' assignments involve assertions that the revised management plan *might* result in violations of the Act at some point in the future. Such assertions are not cognizable under recognized principles of ripeness and justiciability, it contends.

The commission also asserts that a number of petitioners' contentions may summarily be rejected because they involve challenges to portions of the original management plan that were not changed. In a similar vein, the commission also argues that a number of petitioners' contentions may summarily be rejected because they concern the management of the SMAs, which the commission contends is subject to the authority of the Forest Service, not the commission.

Finally, the commission contends that each of petitioners' assignments and subassignments of error is without merit. According to the commission, all of the assignments involve decisions that, under the Act, have been committed to the commission's discretion, and petitioners have failed adequately to explain why any of those decisions amounts to an abuse of that discretion.

We address the parties' contentions in the following manner. We begin with an examination of the overarching question of our standard of review. We then address the question whether any of petitioners' contentions is not ripe for judicial review. We proceed with the question whether any of petitioners' remaining assignments may be summarily rejected because they pertain either to the validity of provisions of the original management plan that were not revised or to the management of the SMAs. We then address any

remaining assignments on the merits. In brief, our conclusions with respect to those contentions are that some of petitioners' assignments are indeed not ripe for judicial review; that the fact that the revised plan includes unaltered provisions from the original plan does not insulate those provisions from judicial review; that the commission is correct in asserting that the management of the SMAs is subject to the revision authority of the Forest Service, not the commission; and that the revised plan does violate the Act in one respect.

## A. *Standard of review*

We begin with the standard of review. As we have noted, this court reviews the matter in the manner in which it reviews an order in a contested case. ORS 196.115(2)(a). To some extent, that standard of review is a less than perfect fit, as the decision at issue is legislative in nature, not an application of law to the facts of a specific case in the context of a record developed in a contested case. There is, in fact, no evidentiary record. Nor are there findings for us to review in this case. And nothing in the Act requires that any such record or findings be made before adoption of the revised management plan.

As a result, we understand our review in this case to be limited to the questions whether the revised management plan is inconsistent with the applicable law or represents an action by the commission outside the range of discretion delegated to it by the law. In other words, we understand petitioners' challenge to be essentially a facial challenge to the validity of the revised management plan, which requires that petitioners demonstrate that the revised plan, on its face, violates the law; that is to say, they must demonstrate that the plan cannot be applied consistently with the law under any circumstance. *See MacPherson v. DAS*, 340 Or 117, 138-39, 130 P3d 308 (2006) (in a facial challenge, petitioner must show that the challenged provision cannot be lawfully applied under any circumstance); *cf. United States v. Salerno*, 481 US 739, 745, 107 S Ct 2095, 95 L Ed 2d 697 (1987) (under federal law, "[a] facial challenge to a legislative Act is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would be valid").

Of course, to determine whether the revised management plan cannot be applied consistently with the Act requires that we determine what the Act requires in the first place. That is to say, we must interpret the Act. Because the Act is a federal statute, when we interpret it, we apply the rules of statutory construction that federal courts are required to apply to congressional enactments. *Corp. of Presiding Bishop v. City of West Linn*, 338 Or 453, 463, 111 P3d 1123 (2005). Generally, federal courts determine the meaning of a federal statute by examining its text and structure and, if necessary, its legislative history. *See, e.g., Department of Revenue of Ore. v. ACF Industries, Inc.*, 510 US 332, 339-46, 114 S Ct 843, 127 L Ed 2d 165 (1994) (following that process in an examination of the federal statute at issue).

When, however, federal courts interpret a statute that has been interpreted by the agency charged with implementing it, there arises the additional question whether the federal courts will accord the agency's construction a measure of deference. In *Chevron U. S. A. v. Natural Res. Def. Council*, 467 US 837, 842-43, 104 S Ct 2778, 81 L Ed 2d 694 (1984) (*Chevron*), the United States Supreme Court announced that, if Congress has clearly indicated its view of the proper interpretation of a statute, then courts are constrained to follow that interpretation. But, the Court added, if Congress has not clearly indicated such a view, then an administrative agency's construction of the statute is controlling as long as it is "reasonable." *Id.* at 843-44.

That deferential standard of review has been the subject of much debate and some more recent refinement. *See* Note, *The Two Faces of* Chevron, 120 Harv L Rev 1562, 1562 n 2 (2007) (observing that over 6,000 law review articles have been published citing *Chevron*). In *United States v. Mead Corp.*, 533 US 218, 228-31, 121 S Ct 2164, 150 L Ed 2d 292 (2001), the Court explained that not every agency construction of a statute is entitled to *Chevron* deference. According to *Mead*, whether *Chevron* deference is accorded depends first on a determination whether Congress intended, either explicitly or implicitly, for such deference to apply. *Id.* at 229. A "very good indicator" of such an intention is congressional contemplation that the agency's action will have "the effect of

law" following some sort of "relatively formal administrative procedure tending to foster the fairness and deliberation that should underlie a pronouncement of such force." *Id.* at 229-30. The absence of such procedures, however, does not necessarily mean that the courts are free to ignore the agency's construction. *Id.* at 230-31. If, for example, the agency has "specialized experience and broader investigations and information" available to it, that agency's interpretation of a federal statute is entitled to "some deference." *Id.* at 234-35.

■    Whether *Chevron* applies to the commission's interpretations of the Act in this case presents an interesting question. Strictly speaking, the commission is not a federal agency. Of course, it is not a state agency, either. It is a "regional" agency that is generally recognized as a "hybrid." *See Columbia River Gorge Comm. v. Hood River County*, 210 Or App 689, 701, 152 P3d 997, *rev den*, 342 Or 727 (2007) (finding the Columbia River Gorge Commission to be a regional agency and explaining that "[r]egional agencies created by interstate compacts are generally recognized to be neither categorically state nor federal in nature; instead, they are hybrids"). But it is a creation of federal law, and it is authorized to carry out and enforce the terms of federal law. It would seem to us that the usual rationales for deference to agency construction—congressional delegation, separation of powers, expertise—would apply as well to the commission in this case as to federal agencies in "ordinary" federal administrative agency cases.

In that regard, we note the decision of the Washington Supreme Court in *Skamania Co. v. Columbia River Gorge Com'n*, 144 Wash 2d 30, 54, 26 P3d 241, 253 (2001), in which the court applied *Chevron*'s two-step analysis to the construction of the Act (although the court ultimately held that the commission's interpretation was not entitled to deference because it ran afoul of the unambiguous text of the Act).

It also is significant that the Act itself charges the commission with the responsibility of developing a management plan that has the effect of law within the scenic area and that the Act requires the commission to adopt the management plan only after the sort of notice-and-comment procedures that the United States Supreme Court explained in

*Mead* were indicative of congressional intent to require deference. Under the circumstances, we conclude that it is appropriate to apply *Chevron* in evaluating petitioners' contentions in this case.

## B. *Ripeness*

We turn to the issue of ripeness. We do so with some caution, for the law in Oregon is somewhat unsettled; even the most recent cases are difficult to reconcile. In *Yancy v. Shatzer*, 337 Or 345, 349, 97 P3d 1161 (2004), for example, the Oregon Supreme Court explained, after a lengthy analysis of the history of the framing of the Oregon Constitution and the case law construing it, that such issues as standing, ripeness, and mootness are aspects of "justiciability," that is, the authority of the court to exercise judicial power as authorized under Article VII (Amended), section 1, of the Oregon Constitution.

Following that, in *Strunk v. PERB*, 338 Or 145, 153, 108 P3d 1058 (2005), the court dismissed a claim of a party because he lacked standing. "Standing," the court explained, "is an aspect of justiciability" and is defined by reference to whether a court's decision will have "some practical effect on [a] party's rights." *Id.*

But then, in *Kellas v. Dept. of Corrections*, 341 Or 471, 478, 145 P3d 139 (2006), the court abjured the notion that standing (and its practical effects requirement) is anything but a statutory conception and—with barely a mention of *Yancy*—cautioned against reading into the judicial power clause of Article VII (Amended), section 1, "constitutional barriers to litigation with no support in either the text or history of Oregon's charter of government." The court was especially disdainful of "import[ing]" into Oregon law federal conceptions of justiciability, given that the federal law is based on a "case or controversy" provision in the federal constitution that finds no counterpart in our own constitution. *Id.*

It is not clear to us what remains of the previous justiciability jurisprudence of this state. The fact is that *none* of the traditionally recognized aspects of justiciability identified in *Yancy*—standing, ripeness, or mootness, for that matter—

finds the sort of direct textual support in the state constitution that, after *Kellas*, the court now appears to require. Yet there are Supreme Court cases that expressly recognize that ripeness is an aspect of justiciability. *E.g.*, *Yancy*, 337 Or at 349; *Noble v. Board of Parole*, 327 Or 485, 490-91, 964 P2d 990 (1998); *McIntire v. Forbes*, 322 Or 426, 433-34, 909 P2d 846 (1996); *Ore. Newspaper Pub. v. Peterson*, 244 Or 116, 119-20, 415 P2d 21 (1966). Indeed, *Kellas* itself quoted from cases in which the court referred to ripeness as an aspect of justiciability, without suggesting that the cases were incorrect in that regard. 341 Or at 485-86 (quoting *McIntire*, 322 Or at 433). Particularly in light of the fact that *Kellas* itself appears to recognize the continuing vitality of a ripeness requirement as an aspect of justiciability, we conclude that, whatever the broader language of that decision might otherwise suggest, ripeness remains a justiciability requirement that we are obliged to address. We turn, then, to the nature of the requirement and whether it is met in this case.

■    The Supreme Court has stated that "a justiciable controversy exists when the interests of the parties to the action are adverse and the court's decision in the matter will have some practical effect on the rights of the parties to the controversy." *Barcik v. Kubiaczyk*, 321 Or 174, 182, 895 P2d 765 (1995) (internal quotation marks omitted). The court has explained that, to be justiciable, a case must—among other things—be "ripe" for decision. *McIntire*, 322 Or at 434. For a claim to be "ripe" in that sense, "[t]he controversy must involve present facts as opposed to a dispute which is based on future events of a hypothetical issue." *Brown v. Oregon State Bar*, 293 Or 446, 449, 648 P2d 1289 (1982); *see also Strunk*, 338 Or at 154 (citing *Brown* and dismissing a claim on the ground that the claim was not ripe and therefore was not justiciable).

It should be noted that the Oregon courts have articulated the ripeness requirement—like all justiciability requirements—as one of constitutional authority. *Brown*, 293 Or at 449. At least to date, the courts have eschewed any notion that justiciability includes, in addition, "prudential" considerations that might result in the discretionary expansion or contraction of categories of cases over which the court

will exercise judicial power. *See, e.g.*, *Yancy*, 337 Or at 361-62 (rejecting authority of Oregon courts to recognize "capable of repetition" exception to the rule against deciding moot cases).

In that regard, Oregon law stands in contrast with the federal case law on justiciability in general and on ripeness in particular. We mention the point because we are aware of one case in which the United States Supreme Court has determined that a challenge remarkably similar to the one before us in this case was not ripe for judicial review.

In *Ohio Forestry Assn., Inc. v. Sierra Club*, 523 US 726, 118 S Ct 1665, 140 L Ed 2d 921 (1998) (*Ohio Forestry*), several conservation groups challenged a land and resource management plan that had been adopted by the Forest Service for Ohio's Wayne National Forest. Under the applicable federal law, the Forest Service was required to establish management plans that create, in effect, zoning maps of permissible uses and that establish basic guidelines by which to determine future use of the land, including logging. The plan did not authorize logging as such, however. Under the plan, a particular logging project at a particular site required further environmental analysis and implementation. The conservation groups nevertheless filed suit, arguing that the plan violated the National Forest Management Act, 16 USC § 1604, by allowing too much logging and clearcutting in the forest.

The United States Supreme Court concluded that the conservation groups' claims were not ripe. The Court explained that, under federal law, whether an agency decision is ripe for judicial review depends on a balancing of the "fitness of the issues for judicial decision" and the "hardship to the parties of withholding court consideration" of those issues. *Ohio Forestry*, 523 US at 733. In this case, the Court explained, delayed review would not unduly prejudice anyone because the challenged forest plan did not itself authorize logging at specific sites or create any rights or obligations. *Id.* at 734-35. In addition, the Court stated, review of the forest plan at that stage might hinder the agency's efforts to refine its policies and deprive it of the opportunity to correct any mistakes in the forest plan before implementation in regard to a site-specific project. *Id.* at 735-36. Finally, the Court added, additional factual development was needed to

determine what the actual effect of the forest plan would be. *Id.* at 736.

It certainly could be argued that the same is true of petitioners' challenge to the commission's revised management plan in this case. Still, we are reluctant to reach that conclusion for at least two reasons.

First, *Ohio Forestry* is a federal decision that arose under the federal constitution—specifically the "case or controversy" provision of Article III. As the Oregon Supreme Court made clear in *Kellas*, we must be skeptical of too quickly importing into Oregon law jurisprudential conceptions that derive from portions of the federal constitution that find no textual counterparts in the constitution of this state. 341 Or at 478.

Second, and apropos of the foregoing point, federal justiciability doctrine is an amalgam of constitutional and "prudential" considerations. *See, e.g., Reno v. Catholic Social Services., Inc.*, 509 US 43, 57 n 18, 113 S Ct 2485, 125 L Ed 2d 38 (1993) (providing that federal ripeness doctrine arises only partly from Article III concerns and arises from "prudential reasons for refusing to exercise jurisdiction," as well). The Court's decision in *Ohio Forestry* is an example of the Court's emphasis on prudential considerations in determining whether, on balance, exercising review authority represents the best use of judicial resources. As we have already noted, such analysis is foreign to Oregon's approach to justiciability—indeed, to Oregon's constitutional analysis generally. *See, e.g., State v. Hirsch/Friend*, 338 Or 622, 639, 114 P3d 1104 (2005) (rejecting "balancing" tests to determine extent of constitutional limits on state authority). *Ohio Forestry*, therefore, does not apply to this case.

We turn to the parties' contentions about the justiciability of the matters at issue in this case. So far as we can tell, all but three of petitioners' assignments and subassignments involve facial challenges that, in essence, assert that the revised management plan conflicts with the requirements of the law. There is no suggestion that those facial challenges are not ripe for judicial review. The commission does suggest, however, that three of petitioners' assignments are not limited to facial challenges and, to the contrary,

involve arguments that the revised management plan *could be* unlawful, depending on how the plan is applied in particular cases in the future. Those assignments, the commission argues, are not ripe for judicial review. We examine each of the three assignments in turn.

### 1. *Assignment of error 2.2*

■ The Act requires that the revised management plan "include provisions to," among other things, require that residential and commercial development outside urban areas take place "without adversely affecting the scenic, cultural, recreation, and natural resources of the scenic area." 16 USC § 544d(d)(7), (8). As we have noted, the statute defines "adversely affect" to refer to "a reasonable likelihood of more than moderate adverse consequences for the scenic, cultural, recreation or natural resources of the scenic area" based on a number of factors, specifically, the context and intensity of the proposed action, its relationship with similar actions, and any proven mitigation measures that will reduce otherwise significant effects of the action. 16 USC § 544(a).

The commission's revised management plan includes a number of guidelines pertaining to scenic resources within the scenic area. The plan declares, in GMA Overall Scenic Policy 1, that, subject to exceptions not pertinent here,

> "nothing in the key viewing areas or landscape settings guidelines in this chapter shall be used as grounds to deny proposed uses otherwise authorized by the land use designation. However, the guidelines may affect the siting, location, size, and other design features of proposed developments, and compliance with them is mandatory."

In their assignment of error 2.2, petitioners contend that the quoted provision violates the Act. According to petitioners, the provision *requires* regulatory authorities to approve certain proposed developments that do not comply with the guidelines for scenic resources. In fact, they argue, commission staff has, on at least some occasions, interpreted the provision to mean just that. If the commission were to adopt such an interpretation, they argue, it would effectively eliminate the possibility that the commission could deny an application for a use that would violate the guidelines pertaining

to scenic resources. That, petitioners contend, obviously violates the Act, which prohibits the revised management plan from permitting uses that would adversely affect the scenic resources of the scenic area.

The commission responds that petitioners' contention is premature because whether the Act is violated—even in the manner in which petitioners contend—depends on the facts of each case. The commission notes that the statute that defines the "adversely affect[ed]" standard itself makes plain that it is based on the "context of a proposed action." 16 USC § 544(a). Aside from that, the commission contends, petitioners' assignment is based on a selective reading of the specifics of GMA Overall Scenic Policy 1. According to the commission, the provision plainly states that, even if the inability of an applicant for a proposed use to comply with certain guidelines is not a ground for outright denial of the application, the guidelines still may affect the siting, location, size, and other design features of the use "and compliance with them is mandatory."

We agree with the commission. To begin with, the fact that the commission *could* interpret GMA Overall Scenic Policy 1 as petitioners suggest does not mean that it will do so. It strikes us that petitioners' assignment is based on precisely the sort of hypothetical assertion—that the provision will, at some point in the future, be interpreted as they predict—that is not cognizable under Oregon law. *Brown*, 293 Or at 449. Aside from that, as the commission correctly has noted, the Act itself defines the "adverse[ ] [e]ffect[s]" that petitioners contend the policy is required to avoid in terms of the facts of each particular case. 16 USC § 544(a). We conclude that assignment of error 2.2 is not ripe for judicial review.

2. *Assignment of error 2.4*

■     A portion of the revised management plan denominated "GMA Key Viewing Areas Policy 11" provides, in part:

"The Commission and Forest Service shall develop a *Scenic Resources Implementation Handbook*, to be approved by the Executive Director and Scenic Area Manager. The Handbook shall provide specific guidance for

applicants and planners in implementing color, reflectivity, landscaping and other guidelines for development on sites visible from key viewing areas."

In their assignment of error 2.4, petitioners contend that the foregoing provision violates the Act. Interestingly, they acknowledge in their brief that "[t]he exact content of the Handbook, which has yet to be developed, is somewhat unclear at this point." They nevertheless insist that it is clear that the commission "intends for the Handbook to rise to the level of a policy or regulatory document that will shield developers who follow its instructions." In other words, petitioners insist, it is clear that the commission intends the handbook to have the "force of law," which is to say that the commission will have unlawfully delegated the development of legally binding land use regulations to the director.

On its face, however, petitioners' argument is purely hypothetical. It is based on the assertion that the commission *could* interpret GMA Key Viewing Areas Policy 11 to permit it to delegate authority to the director to develop a handbook that, in turn, *could* be interpreted as imposing regulations that have the force of law. We conclude that petitioners' assignment of error 2.4 is not ripe.

3. *Assignment of error 2.6*

The revised management plan includes a number of guidelines pertaining to landscape settings and that require the retention of "tree cover screening [new] development from key viewing areas." Those guidelines, however, are subject to exceptions that petitioners contend violate the Act. Petitioners do not identify precisely which of those exceptions they are challenging. They merely assert that the guidelines "are replete with exceptions that swallow the rule." They do give citations to three such exceptions as "examples," after which they complain that each such exception is so broadly worded that it *could* be interpreted to allow development in violation of the Act. According to petitioners, "[e]ach exception is easily subject to erroneous interpretation that could harm scenic resources."

The commission responds that, once again, petitioners' complaint is premature, as it is predicated on the mere

possibility that, in some future case, the commission could interpret the provisions of the revised management plan in a way that would violate the Act.

We agree with the commission. Petitioners' assignment of error 2.6 is purely hypothetical and, as such, not ripe for judicial review.

C. *Reviewability of unchanged plan provisions*

Approximately half of petitioners' remaining assignments relate—at least in part—to provisions of the revised management plan that were not actually revised by the commission and represent the re-adoption of provisions of the original plan. The commission contends that we may summarily reject all of those assignments. According to the commission, it was required by budget constraints to reduce its scope of work and limit its revisions to a relatively few priority provisions of the existing plan. In light of those budget constraints, it argues, the commission did not abuse its discretion in so limiting its revisions. Aside from that, the commission argues, under *1000 Friends of Oregon v. Jackson Co.*, 79 Or App 93, 98, 718 P2d 753, *rev den*, 301 Or 445 (1986), petitioners are not permitted to challenge any provisions of the original plan unless the more recent revisions have the effect of rendering the original provisions unlawful. Petitioners respond that nothing in the Act limits the scope of their challenge to only those portions of the management plan that were actually revised.

■ We agree with petitioners. The commission's argument that its decision to reduce its scope of work was a reasonable response to budget constraints is something of a *non sequitur*. It may well be the case that the commission responded reasonably—and lawfully—in deciding to limit its actual revisions to a few priority provisions. But that simply is not responsive to the question whether the unchanged portions of the plan are thereby insulated from judicial review. Either the management plan, as revised, violates the Act or it does not. The fact that the process by which the commission arrived at the final product was a reasonable one does not alter the lawfulness—or unlawfulness, as the case may be—of the product itself.

*1000 Friends of Oregon* is not to the contrary. In that case, the Land Use Board of Appeals (LUBA) rejected the petitioner's challenge to an amendment to a local government comprehensive plan because the challenge was, in effect, directed only at the provisions of the comprehensive plan that had not been changed by the amendments. 79 Or App at 97-98. We reversed, concluding that we "do *not* agree that LUBA's review of plan amendments * * * is limited to the provisions that the amendments directly create or alter." *Id.* at 98 (emphasis added). Among other things, we explained, the plan amendment *"could* affect provisions of the plan that it does not directly change in such a way that they will have an application which is at odds with the goals and which they did not have at the time of acknowledgment." *Id.* (emphasis in original). Thus, *1000 Friends of Oregon* involved the reviewability of a discrete amendment, not an entire management plan. Moreover, in that case, we concluded that review was *not* limited to the validity of the amendment.

We therefore reject the commission's suggestion that we may summarily dispose of a number of petitioners' assignments on the ground that they effectively involve challenges to provisions of the original plan.

D. *Reviewability of provisions related to the SMAs*

The commission also contends that a number of other assignments—specifically, assignments 2.7, 5, 7, and 12 and portions of 3.3, 3.4, 8, and 13—may be summarily rejected on the ground that they involve challenges to the validity of provisions of the revised management plan that relate to the SMAs, which are subject to the authority of the Secretary of Agriculture and the Forest Service, not the commission. Petitioners respond that, although "[i]t may appear at first blush" that the wording of the Act limits the commission's authority over the SMAs, careful examination makes clear that the Act requires the commission to review the SMA provisions of the management plan.

More specifically, the parties' contentions concern the proper construction of the following provision of the Act:

"No sooner than five years after adoption of the management plan, but at least every ten years, the Commission shall review the management plan to determine whether it should be revised. The Commission shall submit any revised management plan to the Secretary for review and concurrence, in accordance with the provisions of this section for adoption of the management plan."

16 USC § 544d(g).

Petitioners emphasize the portion of the foregoing provision that requires the commission to review "the management plan." According to petitioners, that requires the commission to review the entire management plan, relating to management of both the GMAs and SMAs.

■ The commission, on the other hand, contends that petitioners simply ignore the portion of the statute that requires it to submit the revised management plan to the Secretary of Agriculture for review and concurrence *in accordance with the provisions of this section for adoption of the management plan*. The commission notes that the provisions of the Act pertaining to the adoption of the management plan make abundantly clear that the management of the SMAs is subject to the exclusive authority of the Secretary of Agriculture and the Forest Service, not the commission.

The commission's point is well taken. The Act specifically provides that it is the responsibility of the Forest Service (and, ultimately, the Secretary of Agriculture) to develop guidelines for the SMAs. 16 USC § 544f. Those guidelines are required to be transmitted to the commission, and the commission, in turn, is required to "incorporate *without change* the management direction for the use of Federal lands within and the land use designations for the special management areas adopted by the Secretary pursuant to section [544f] of this Act." 16 USC § 544d(c)(4) (emphasis added). It is in that context that the Act requires the commission to submit revisions of the management plan to the Secretary of Agriculture for review and concurrence "in accordance with the provisions of this section for adoption of the management plan." 16 USC § 544d(g). Those provisions plainly require the commission to adopt the Secretary of Agriculture's SMA guidelines

"without change." There is no other provision in the Act authorizing the commission to regulate the SMAs.

Under the circumstances, there is only one reasonable reading of the applicable statutes: The Act authorizes the Secretary of Agriculture, not the commission, to develop provisions of the management plan pertaining to the SMAs. And the portions of the Act requiring the commission to engage in a process of review and revision of the management plan do not authorize the commission to invade the exclusive authority of the federal government in managing federal lands and the SMAs. Even assuming that the matter were not so clear, however, we would reach the same result under the deferential standard that *Chevron* requires. The commission's reading of the statute is reasonable, at the very least, and that is sufficient under *Chevron*. We therefore summarily reject petitioners' assignments 2.7, 5, 7, and 12 and the portions of 3.3, 3.4, 8, and 13 that pertain to the SMAs.

E. *Remaining assignments*

There remain some 15 assignments of error, which we now address on the merits.

1. *Assignment of error 1*

In their first assignment of error, petitioners contend that the revised management plan is unlawful because the review process by which it was created was "incomplete." Petitioners contend that the Act requires the commission to review "the management plan," 16 USC § 544d(g), that is, the entire management plan, then determine from that review whether the plan should be revised, and then make the appropriate revisions. According to petitioners, the commission failed to complete the first step because it limited its review to selected portions of the management plan.

The commission responds that the process by which it produced the revised management plan was not incomplete. The commission notes that nothing in the Act spells out precisely how it is to perform its review function. Instead, it argues, the Act leaves to the commission's discretion how to accomplish the review of the management plan. In this case,

the commission notes, it did not limit its review of the management plan to any particular provisions. To the contrary, it held public meetings and solicited comments from the public on *any* aspect of the management plan. The process produced approximately 1,600 comments, each of which the commission reviewed and considered in developing its scope of work. The fact that the process resulted in changes to only selected provisions of the management plan, the commission contends, does not mean that the review process itself was unlawfully incomplete.

We agree with the commission. As we have noted, the Act provides that, at least every ten years, "the Commission shall review the management plan to determine whether it should be revised." 16 USC § 544d(g). In ordinary parlance, to "review" is "to take a view of : examine with consideration or attention." *Webster's Third New Int'l Dictionary* 1944 (unabridged ed 2002). The Act says nothing about how the commission is to conduct that view or examination, how the scope of the review is to be determined, or what criteria might apply in determining whether the plan should be revised. Congress plainly left those decisions to the discretion of the commission, and, indeed, all parties appear to agree that we must review this particular assignment for whether the commission acted "[o]utside the range of discretion delegated to the [commission] by law." ORS 196.115(3)(d)(A).

In response to the Act's directive, the commission produced a series of monitoring reports, which evaluated the extent to which the existing management plan and guidelines met the requirements of the Act. As we have noted, the commission produced seven such monitoring studies, including reports concerning scenic, cultural, recreational, and natural resources, and concerning agricultural and forest lands. The commission then solicited comments from, and held public hearings on, whether *any* provisions of the existing management plan were in need of revision. There is no contention that the commission limited the scope of its request for comments to any particular provisions of the management plan.

Based on its monitoring studies and on the comments that it received from the public, the commission developed a list of 26 specific topics for more detailed examination.

The commission then held further public hearings on that proposed list and on its adequacy to meet its obligations under the Act.

In response to federal and state budget constraints, the commission held additional public hearings on the impact of those budget cuts on the process. Interestingly, in response to the cuts, one of the petitioners—Friends of the Columbia Gorge—wrote to the commission expressing support for a narrowing of the scope of the review process, asserting that "Friends of the Columbia Gorge believes that the Gorge Commission *has already fulfilled its statutory obligation* to review the Management Plan for possible revisions and may complete the Plan review process at this time." (Emphasis added.) In response to the budget cuts and the comments that it received, the commission further narrowed the scope of its review process.

Under the circumstances, we are hard pressed to articulate how the commission violated the Act, which simply requires the commission to "review the management plan to determine whether it should be revised." It appears that the commission did precisely what the law requires—it reviewed the entirety of the management plan and developed a process for determining which of the plan's provisions should be targeted for revision.

Petitioners insist that the commission's review process resulted in a host of provisions remaining unchanged, which, in turn, has produced a revised plan that is unlawful in a number of respects. Petitioners note as examples of this problem the fact that the commission neglected to update gross annual income figures that are used to determine the existence of commercial agricultural enterprises; neglected to address implementation problems identified in its own monitoring reports; failed to correct mistakes in the original management plan; and failed to update what petitioners characterize as "time-sensitive" portions of the management plan. We put aside the fact that the commission contests each of those assertions. For our purposes, the dispositive point is that, in making that argument, petitioners conflate the requirement that the commission "review" the plan for possible revision and the requirement that the revised plan itself

conform to the requirements of the law. The mere fact that, as revised, the plan may contain what petitioners believe to be mistakes and inadequacies does not establish that the commission did not review the entire original management plan before determining whether to revise the provisions about which they complain.

We conclude that the commission, in conducting its review of the management plan, did not act "[o]utside the range of discretion delegated to the [commission] by law." ORS 196.115(3)(d)(A).

### 2. *Assignment of error 2.1*

As we have noted, the Act requires the commission to adopt a management plan that "include[s] provisions" to require that residential and commercial development in the scenic area "take place without adversely affecting the scenic, cultural, recreation, or natural resources of the scenic area." 16 USC § 544d(d)(7), (8). "Adversely affecting," in turn, is defined as having "a reasonable likelihood of more than moderate adverse consequences for the scenic, cultural, recreation or natural resources of the scenic area," based on the context and intensity of a particular proposed action along with, among other things, its relationship with others "which are individually insignificant but which may have cumulatively significant impacts." 16 USC § 544(a).

The original management plan included a number of provisions concerning so-called "cumulative effects," which provisions were incorporated without change into the revised management plan. Those cumulative effects provisions include GMA Key Viewing Guideline 3, which provides that "[d]etermination of potential visual effects and compliance with visual subordinance policies shall include consideration of the cumulative effects of proposed development." They also include GMA Landscape Settings Policy 5, which provides that "Compatible Recreation Use Guidelines" for each landscape setting "shall provide the basis for evaluating cumulative effects of recreation proposals on landscape settings, including types and intensities of recreation uses." And the revised management plan includes a definition of "cumulative effects," which provides that the term refers to the

"combined effects of two or more activities. The effects may be related to the number of individual activities, or to the number of repeated activities on the same piece of ground. Cumulative effects can result from individually minor but collectively significant actions taking place over a period of time."

In their assignment of error 2.1, petitioners argue that the foregoing provisions of the revised management plan are unlawful. According to petitioners, "the provisions are simply too vague to be implemented." In particular, they argue, the revised management plan lacks specific "standards, guidelines, or criteria for determining what causes adverse cumulative impacts to scenic resources, how to measure such impacts, or how they are regulated." As a result, they argue, in adopting the revised management plan, the commission acted outside the range of discretion delegated to it by law and violated the Act.

The commission responds that nothing in the Act requires it to address cumulative impacts in any particular way or in any particular level of detail. Aside from that, the commission argues, the fact is that the revised management plan does address the matter of cumulative impacts in a number of ways, including express requirements that each proposed development be reviewed for its cumulative impact and the identification of specific design guidelines and compatible recreation use guidelines. The commission acknowledges that it has identified the general area of cumulative impacts as one requiring further effort and refinement, work that the commission decided to defer in light of budgetary constraints. But, argues the commission, the fact that it decided to defer that work does not mean that the existing plan violates the law.

We agree with the commission. To begin with, petitioners bear the burden of demonstrating in this facial challenge that the revised management plan cannot be lawfully applied under any circumstance. *MacPherson*, 340 Or at 138-39. In that light, even assuming that the revised management plan's several provisions expressly requiring consideration of cumulative effects of a proposed action are "vague"—apparently in something other than a constitutional sense—

that fact does not necessarily mean that the plan cannot be lawfully applied. Petitioners cite no authority for their assertion in that regard, and we are aware of none. The fact is that the Act contains no provision requiring the commission to spell out specific standards for determining, in advance, what causes adverse cumulative effects to scenic resources. To the contrary, the Act makes quite clear that what constitutes an "adverse[ ] [e]ffect," of which cumulative effects are a component, is a matter determined in the context of specific applications in light of their intensity, their relationship with other similar actions, and any mitigation measures that may be required. 16 USC § 544(a). The statute is unambiguous on that point. But even if that were not so, we would arrive at the same conclusion under the deferential standard that *Chevron* requires. The commission's reading of the Act to not require more detailed *a priori* standards for determining adverse cumulative effects is at least a reasonable construction of the statute. We conclude that the commission did not act in violation of the federal law or act outside the range of discretion delegated to it under that law. ORS 196.115(3)(d).

### 3. *Assignment of error 2.3*

■ In their assignment of error 2.3, petitioners contend that the siting guidelines provisions of the revised management plan violate the Act's adverse effect provisions. In the original management plan, GMA Key Viewing Areas Guideline 6 provided, in part:

> "New buildings or roads shall be sited on portions of the subject property that minimize visibility from key viewing areas, unless the siting would place such development in a buffer specified for protection of wetlands, riparian corridors, sensitive plants, or sensitive wildlife sites or would conflict with guidelines to protect cultural resources."

GMA Key Viewing Areas Guideline 7, also in the original management plan, provided:

> "In siting new buildings and roads, use of existing topography and vegetation to screen such development from key viewing areas shall be given priority over other means of achieving visual subordinance, such as planting new vegetation or using artificial berms to screen the development from key viewing areas."

In November 2000, the commission published a "Scenic Resources Report" as part of the review process that the Act requires. The report included observations that, in the past, "improper siting" had contributed to some developments not being visually subordinate. The report recommended that, in the future, the commission require agencies "to site structures on portions of properties to minimize visibility from key viewing areas."

Following the review process, however, the commission decided to alter Guideline 6 so that the first sentence now begins, "New development shall be sited to achieve visual subordinance from key viewing areas[.]" The commission also reworded Guideline 7 so that it now requires that "[n]ew development shall be sited using existing topography and/or existing vegetation as needed to achieve visual subordinance from key viewing areas."

According to petitioners, the commission's rewording of the provision constitutes a substantial "weakening" of the plan's siting guidelines. They contend that the changes "effectively remove" siting as a mandatory requirement and, in the process, violate the Act. They further complain that the rewording of the provision represents an unlawful departure from prior agency rule or practice, in that the revised management plan—which did not follow the recommendations of the Scenic Resources Report—is now "inconsistent with [the commission's] own conclusions."

The commission responds that just because it altered the wording of the policy from requiring uses to "minimize visibility" to requiring that they achieve "visual subordinance" does not demonstrate that it violated the law. Indeed, argues the commission, even assuming that the word change does "weaken" the management plan guidelines, that fact alone does not establish a violation of the statute. In any event, the commission notes, the original plan itself plainly required "visual subordinance." Both the original and the revised plans contain a definition of "visually subordinate," and that definition requires only that a proposed structure or use "does not noticeably contrast with the surrounding landscape, as viewed from a specified vantage point (generally a key viewing area * * *)." Both the original and the revised

plans, the commission adds, expressly provide that "structures that are visually subordinate may be partially visible. They are not visually dominant in relation to their surroundings." The problem was that the original plan—which required development to be invisible, if possible—was more restrictive than the policy that it was supposed to implement. All that it did in revising the plan, the commission continues, was bring the guideline into conformance with the policy. That, the commission concludes, hardly constitutes a violation of the Act.

We agree with the commission. Again, petitioners bear the burden of demonstrating that the revised management plan *cannot* be lawfully applied. *MacPherson*, 340 Or at 138-39. In this case, petitioners have not met that burden. To begin with, the Act requires that the management plan include provisions to require that commercial and residential development outside urban areas take place "without adversely affecting the scenic, cultural, recreation, and natural resources of the scenic area." 16 USC § 544d(d)(7), (8). The Act does not define what is necessary to prevent adverse effects to "scenic" resources; specifically, it does not require a particular level of visibility of new developments.

In that regard, petitioners do not contend that the commission's determination of what is permissible—"visual subordinance"—violates the Act. Petitioners' argument is that, because the original management plan required a more restrictive means of accomplishing visual subordinance, the commission's decision to "weaken" the plan in that regard *ipso facto* demonstrates that it has unlawfully permitted adverse effects to occur. As the commission correctly notes, the argument simply does not follow that, merely because the revised plan is not as restrictive as the original plan, the revised plan must violate the Act.

As for the fact that the final version of the revised management plan departs from the recommendations in the Scenic Resources Report, petitioners do not explain—and we do not perceive—how that produces an unlawful departure from "an agency rule, an officially stated agency position or a prior agency practice." ORS 196.115(3)(d)(B). As we have noted, the Scenic Resources Report represents the work of

the staff of six counties, the Forest Service, and the commission. It contains *recommendations* for future consideration by the Forest Service and the commission. The fact that the commission did not follow a report recommendation does not, by itself, establish a violation of the Act. We reject petitioners' assignment of error 2.3.

4. *Assignment of error 2.5*

Petitioner's assignment of error 2.5 also relates to the portion of the revised management plan that concerns scenic resources and its requirement that development visible from key viewing areas be "visually subordinate" to the surrounding landscape. The original management plan required visual subordination—by landscape screening, for example—to occur within two years of the development approval. In the revised management plan, the commission extended the time to achieve visual subordination from two years to "five years or less from the commencement of construction." Petitioners contend that that extension of time represents a violation of the Act. Their rationale is not entirely clear. It appears to be that, because the commission originally required visual subordination within two years, it must be assumed that such a period was necessary to comply with the Act; that being the case, the extension of the deadline from two years to five must violate the Act. Petitioners cite *Rust v. Sullivan*, 500 US 173, 111 S Ct 1759, 114 L Ed 2d 233 (1991), although they do not explain how that opinion supports their assignment of error.

The commission responds that, to begin with, it had good reason for extending the period within which visual subordination is achieved. Among other things, the commission argues, it was responding to public testimony and to the views of the Oregon Chapter of the American Society of Landscape Architects that larger trees—which better achieve the goal of visual subordination—are more difficult to keep alive after transplantation than smaller trees and that the additional time was required to allow landscaping to mature into effective screening. Aside from that, the commission contends, the mere fact that it decided to extend the time for compliance does not, by itself, establish a violation of the Act.

Once again, we agree with the commission. Petitioners' argument, at least as we understand it, is premised upon the logical flaw of confusing what is sufficient with what is necessary to satisfy a legal standard. The fact that the original plan determined that achieving visual subordination within two years is *sufficient* to satisfy the requirements of the Act does not necessarily mean that the requirement is *necessary* to do so. Thus, by itself, the mere fact that the commission decided to extend the period for compliance does not establish a violation of the federal statute.

*Rust* is not to the contrary. In that case, the United States Supreme Court *upheld* an agency's interpretation of federal law and *rejected* the argument that the interpretation was entitled to no deference under *Chevron* merely because it represented a break with past interpretations of the same statute. *Rust*, 500 US at 186-87. The Court explained:

> "This Court has rejected the argument that an agency's interpretation 'is not entitled to deference because it represents a sharp break with prior interpretations' of the statute in question. In *Chevron*, we held that a revised interpretation deserves deference because '[a]n initial agency interpretation is not instantly carved in stone' and 'the agency, to engage in informed rulemaking, must consider varying interpretations and the wisdom of its policy on a continuing basis.' "

*Id.* at 186 (quoting *Chevron*, 467 US at 863-64) (internal citation omitted). The Court held that agencies have "ample latitude" to adapt rules and policies to meet the demands of changing circumstances, as long as the agency explains the change in position. *Rust*, 500 US at 187.

In this case, it is not clear that, at least with respect to this assignment of error, the commission has interpreted the Act in the first place, much less that it altered an interpretation of the Act in the revised management plan. As we have noted, a determination that either a five-year deadline or a two-year deadline suffices under the Act by no means implies a change in the interpretation of what the Act requires. But, in any event, petitioners do not explain—and we do not perceive—why the commission's explanation for its

shift in position is not at least minimally justified. We reject assignment of error 2.5.

### 5. *Assignment of error 3.1*

Petitioners' assignment of error 3.1 targets another part of the revised management plan that addresses cumulative effects, in this case with respect to the natural resources of the scenic area. Their argument is essentially the same one that they advance in assignment of error 2.1 with respect to the provisions of the revised management plan pertaining to cumulative effects on scenic resources; that is, petitioners argue that the revised management plan is too vague, lacking any "specific criteria" to determine in advance what constitutes adverse cumulative impacts to the natural resources of the scenic area. We reject assignment of error 3.1 for the same reasons that we have rejected assignment of error 2.1.

### 6. *Assignment of error 3.3*

In their assignment of error 3.3, petitioners argue that the revised management plan violates the Act because its provisions pertaining to riparian buffers fail to prevent adverse effects to natural resources. Petitioners do not quote the offending provisions of the revised management plan. As we understand it, however, the plan includes guidelines relating to "Wetlands Buffer Zones" and "Stream, Pond, and Lake Buffer Zones." Those guidelines generally require that "[a]n undisturbed buffer should be preserved around wetlands to protect and enhance wetlands functions and associated uplands." Similarly, the guidelines provide that "[p]roposed uses adjacent to streams, ponds, and lakes should preserve an undisturbed buffer zone that is wide enough to protect aquatic and riparian areas." And the guidelines specify how the buffer zones should be measured ("outward from a wetlands boundary on a horizontal scale that is perpendicular to the wetlands boundary," "landward from the ordinary high water mark on a horizontal scale that is perpendicular to the ordinary high watermark," and "landward from the normal pool elevation of the Columbia River"), as well as specific widths varying from 50 feet to 150 feet or more, depending on the nature of the riparian area.

Petitioners apparently contend that the buffer zones should have been wider. They contend that, during the review process, a number of entities and individual witnesses—including the Washington Department of Fish and Wildlife, a professional biologist, and a water resources engineer—recommended expanding the buffer zones and that the commission violated the Act in failing to respond appropriately to that information. Aside from that, petitioners contend, the phrasing of the guidelines is merely permissive, declaring only that buffers "should" be preserved, not that they must be preserved. That, too, in petitioners' view, violates the requirement of the Act that the revised management plan include provisions to prevent adverse effects to natural resources in the scenic area. They conclude that the commission therefore acted outside the range of discretion delegated to it under the Act and violated the Act itself.

The commission responds that petitioners have failed to demonstrate that the revised management plan cannot be applied consistently with the requirements of the Act or that it abused its discretion in deciding not to revise its existing buffers. The commission notes that, in fact, it did not ignore the information that petitioner identifies. To the contrary, it considered the information and discussed its implications. In particular, the commission notes that it considered the fact that buffer width is only one of a number of relevant considerations and that increased buffers actually can be less protective, depending on the nature of the activities permitted within them. The commission contends that its decision to adhere to existing buffers was driven by the complexity of the issue, the need for additional data, and the possibility that acting without the additional information could itself have an adverse effect on the natural resources of the scenic area.

We agree with the commission. To begin with, petitioners again have failed to explain how the fact that the commission decided not to change existing buffers means that the management plan cannot be applied consistently with the requirements of the Act. In particular, petitioners do not explain how using the term "should" renders the guidelines unlawful. The term can be used to denote duty, obligation, or

necessity. *Webster's* at 2104. The revised plan simply does not necessarily make compliance with the buffers "optional," as petitioners suggest.

Aside from that, we do not understand how the commission abused the discretion delegated to it by the Act in merely declining to alter existing buffer standards, particularly in light of the undisputedly complex nature of the issues and the inadequacy of existing data. Petitioners appear to assume that the mere fact that someone suggested during the review process that existing buffers are inadequate establishes that such is the case. Petitioners cite no authority for the proposition that the commission abused its discretion in deciding not to act on the basis of such information, and we are aware of none. We conclude that the commission did not violate the Act or abuse the discretion delegated to it under the Act in adhering to existing riparian area buffers.

### 7. *Assignment of error 3.4*

In their assignment of error 3.4, petitioners contend that the revised management plan violates the Act because it "allows cattle grazing anywhere in the GMA as a 'use allowed outright' without *any* review for protection of natural resources." (Emphasis in original.) Unfortunately, the argument in support of that assertion consists—in its entirety—of three brief paragraphs unaccompanied by any quotations from the provisions that supposedly violate the Act or citations to any particular provision of the Act that the unquoted provisions of the plan are supposed to violate. There is a single citation—"RMP at II-109"—but the revised management plan at that particular page does not mention cattle grazing. There is mention of certain agricultural uses being permitted as uses allowed outright. Apparently, we are to deduce that grazing of cattle is included within the reference to permitted "agricultural uses" and that petitioners' argument is that the fact that the revised plan permits unencumbered cattle grazing in such places as riparian areas violates the Act.

The commission responds that the revised plan does not, in fact, allow cattle grazing "anywhere in the GMA." To the contrary, the commission asserts, grazing is prohibited in "most Open Space areas and requires a permit in the other

open space areas." Also, the commission notes, grazing requires a permit and a range conservation plan to protect natural resources in land designated "Agriculture—Special."

Petitioners reply that, although the revised management plan may regulate some cattle grazing, the fact remains that there are at least some areas within the scenic area in which cattle grazing is permitted without oversight, and that fact violates the Act.

Once again, petitioners' burden on review is dispositive. In short, they have failed to explain why the revised management plan cannot be applied consistently with the Act. Assuming for the sake of argument, for example, that the revised management plan does permit unregulated cattle grazing in at least some portions of the GMAs, petitioners do not explain how that violates the Act. They assert that there is evidence that cattle grazing has "a high potential to adversely affect water resources." But evidence of that "potential" does not satisfy their heavy burden of showing that the plan, on its face, violates the Act. The Act does not require the commission to eliminate all potential harm to the resources of the scenic area. It requires the commission to include provisions that protect against "adverse[ ] [e]ffect[s]," defined by statute as requiring an examination of the context and intensity of each proposed use. We reject petitioners' assignment of error 3.4.

## 8. *Assignment of error 3.5*

As we have noted, the Act requires the commission to adopt a management plan to require that residential and commercial development outside urban areas take place without adversely affecting scenic, cultural, recreation, or natural resources of the scenic area. 16 USC § 544d(d)(7), (8). The revised management plan, however, includes a provision that expressly exempts from its guidelines and policies certain portions of the main stem of the Columbia River itself, leaving those areas subject to existing federal and state laws:

> "The stream, pond, lake, and riparian area goals, policies, and guidelines in the Management Plan shall not apply to those portions of the main stem of the Columbia River that adjoin the Urban Areas. The Gorge Commission

will rely on the applicable federal and state laws to protect those portions of the Columbia River that adjoin the Urban Areas."

In a very brief assignment of error 3.5, petitioners contend that the "vaguely worded exemption" violates the Act, which they contend plainly requires the management plan to regulate the entire scenic area.

The commission responds that the provision actually is unchanged from the original management plan and that, in any event, petitioners have entirely neglected to explain why or how existing federal and state regulations pertaining to the affected portions of the Columbia River are not adequate to satisfy the requirements of the Act.

We agree with the commission. Petitioners indeed have not explained why the many existing state and federal regulations that apply to the affected portions of the Columbia River itself are not sufficient to protect against the adverse affects that the Act prohibits. We reject assignment of error 3.5 without further discussion.

### 9. *Assignment of error 3.6*

In their assignment of error 3.6, petitioners complain that the revised management plan "fails to inventory and protect geologic resources and require avoidance of residential and commercial development within geologic hazard areas." That failure, they contend, violates the Act's mandate to protect and enhance natural resources.

The commission responds that nothing in the Act requires the management plan to include provisions specifically protecting "geologic resources" or avoiding "geologic hazards." What the Act requires, the commission observes, is the preparation of an inventory of "natural features and limitations," 16 USC § 544d(a)(1)(A), and that the land use designations in the management plan be based on the results of the inventory, 16 USC § 544d(b)(1). The commission contends that it accomplished precisely those tasks. It completed a natural features and limitations inventory in 1988 and, based on that inventory, designated natural features with

outstanding scenic, natural, and cultural features as protected "Open Space" and required consideration of the presence of geologic hazards in determining the suitability of lands for particular uses.

Petitioners reply that, even if the commission did complete a natural features and limitations inventory, the fact remains that the revised management plan does not contain a single policy or guideline that is specifically directed at protecting geologic resources or protecting against geologic hazards. Petitioners concede that the Act actually does not mention "geologic resources" or "geologic hazards." But they insist that geologic resources remain part of the scenic area's "natural resources" and that geologic hazards are among the "physical characteristics" that the Act requires the commission to take into account.

Petitioners' argument founders against the fact that the Act simply does not require the commission's management plan to specifically address geologic resources or geologic hazards. Petitioners' contention that such a requirement may be discerned in the general phrasing of the Act's reference to "natural * * * resources" or "physical characteristics" proves too much. Native plants are a natural resource in the scenic area, but that does not mean that the Act requires the management plan to include provisions specifically addressing the protection of each and every one. Likewise, fall foliage in the scenic area is a physical characteristic, but that does not mean that the management plan must include provisions specifically pertaining to that phenomenon. If Congress had wanted such specifics included in the commission's management plan, all it had to do was say so. At best, the statute is ambiguous on the point, which merely triggers *Chevron* and deference to the commission's reasonable construction of the very broad language of the Act. We reject assignment of error 3.6.

10. *Assignment of error 4.1*

In their assignment of error 4.1, petitioners advance another claim that the revised management plan inadequately protects against adverse cumulative effects, in this

case with respect to cultural resources. Once again, petitioners complain that the vague provisions of the revised management plan contain no specific provisions identifying, in advance, "what causes adverse cumulative impacts to cultural resources, how to measure such impacts, or how they are regulated."

The commission notes that a number of provisions in the management plan address the protection of cultural resources. GMA Cultural Resources Policy 1, for example, provides that "well-defined geographic areas that possess large concentrations of cultural resources shall be designated Open Space" and thus are subject to regulation. GMA Cultural Resources Policy 5 provides that the commission shall conduct "reconnaissance surveys" for all new developments with ground disturbance, except for, among others, proposed uses that involve only minor disturbance, uses on lands that have been adequately surveyed in the past, and uses occurring in areas with a low probability of containing cultural resources as determined by the completed reconnaissance surveys.

The management plan, the commission observes, also requires minimum parcel sizes for land divisions, based on, among other things, the existence of cultural resources. Similarly, the plan provides that lands may be suitable for commercial recreation if their development "would not adversely affect significant cultural resources." Under the circumstances, the commission argues, petitioners' contention that the plan does not protect cultural resources is not true. Moreover, and in any event, it argues, the Act does not require the management plan to contain the sort of specific cumulative effects analysis for which petitioners contend.

We agree with the commission, for essentially the same reasons that we have rejected petitioners' other assignments of error concerning a lack of specific cumulative effects regulations. As we noted with respect to assignments of error 2.1 and 3.1, petitioners here simply fail to demonstrate that the management plan *cannot* be applied in a manner consistent with the requirements of the Act. The fact is that nothing in the Act requires the commission to spell out, in advance, what constitutes an adverse cumulative effect on

cultural resources. In any event, at the very least, the commission's reading of the Act not to require it to define, in advance, what circumstances constitute adverse cumulative effects to cultural resources is reasonable and, as a result, entitled to deference under *Chevron*. We reject assignment of error 4.1.

### 11. *Assignment of error 6*

■ The Act requires, among other things, that the revised management plan include provisions to "protect and enhance agricultural lands for agricultural uses." 16 USC § 544d(d)(1). In their assignment of error 6, petitioners contend that the revised management plan violates that requirement. Once again, petitioners do not identify which provisions of the plan are actually at issue. They simply contend that the failure of the commission to change the original management plan is unlawful in light of the fact that a staff monitoring report found that some agencies were not implementing those provisions of the plan properly.

The commission responds that, indeed, a staff report had noted that agencies were not properly implementing the agricultural land provisions of the original plan. The commission notes, however, that the staff report went on to recommend, in lieu of changing the plan, conducting workshops to improve implementation of the existing guidelines. The commission observes that, in response to public comments, it did consider clarifying its agricultural land provisions, but ultimately decided against doing so because, among other things, it determined that the real problems involved implementation, not the guidelines themselves. According to the commission, petitioners have failed to demonstrate why the decision to do that amounts to an abuse of discretion; nor have they established that the revised management plan itself cannot be applied consistently with the Act.

The commission is correct. As we have stated with respect to a number of similar arguments by petitioners, the fact that the commission decided not to change the existing management plan does not demonstrate that it abused the discretion delegated to it under the Act. Moreover, petitioners have failed to demonstrate how the existing provisions of the management plan violate any provision of the Act itself.

## 12. *Assignment of error 8*

■        Petitioners' assignment of error 8 concerns the Act's requirement that the revised management plan "protect and enhance open spaces." 16 USC § 544d(d)(3); *see also* 16 USC § 544d(b)(4) (requiring that land use designations be "suitable for the protection and enhancement of open spaces"). In response to that requirement, the original management plan created an Open Space land use designation and specified that only the "[m]aintenance, repair, and operation of existing dwellings, structures, trails, roads, railroads, and utility facilities" may occur in the SMAs. In the revised management plan, the commission added to that list of uses permitted in Open Space areas of the GMAs the replacement or expansion of existing culverts, "provided the entity or person owning or operating the culvert shall obtain all necessary federal and state permits that protect water quality and fish and wildlife habitat before construction."

Petitioners contend that the addition of replacement or expansion of culverts to the list of permitted uses in Open Space areas violates the Act because "[c]ulvert replacement and expansion in Open Space zones has a high likelihood of adversely affecting scenic, natural, cultural, and open space resources." The commission responds that petitioners ignore the fact that culvert replacement or expansion is not permitted outright, with no oversight at all. To the contrary, the revised management plan expressly provides that any person owning or operating the culvert must obtain all necessary state and federal permits that protect water quality and wildlife. Aside from that, the commission contends, petitioners identify no basis for their assertion that culvert replacement and expansion has a "high likelihood" of adversely affecting the resources in the scenic areas. Indeed, the commission notes, those culverts—by definition—are already located in disturbed rights-of-way, namely, underneath roads or in roadside ditches.

We again agree with the commission. Petitioners do not identify any source for their assertion concerning the "high likelihood" of adverse effects. Moreover, petitioners have failed to explain why the existing framework of federal and state water quality and fish and wildlife permitting is

inadequate to meet the requirements of the Act. We conclude that petitioners have not met their burden of demonstrating that the revised management plan cannot be implemented in accordance with the Act.

### 13. *Assignment of error 9*

In their assignment of error 9, petitioners contend that the revised management plan violates the Act because it expressly permits small-scale fishing support and fish processing operations. The Act requires that the management plan include provisions to "prohibit industrial development in the scenic area outside urban areas." 16 USC § 544d(d)(6). The Act does not define "industrial development."

The revised management plan defines the term "industrial uses":

> "**Industrial uses:** Any use of land or water primarily involved in:
>
> "1.  Assembly or manufacture of goods or products,
>
> "2.  Processing or reprocessing of raw materials, processing of recyclable materials or agricultural products not produced within a constituent farm unit,
>
> "3.  Storage or warehousing, handling or distribution of manufactured goods or products, raw materials, agricultural products, forest products, or recyclable materials for purposes other than retail sale and service, or
>
> "4.  Production of electric power for commercial purposes."

(Boldface in original.) The plan's general policies and guidelines also include a section devoted to "small-scale fishing support and fish processing operations." The section begins by recognizing that fishing "is a historic natural resource based industry in the National Scenic Area." It then declares that, to support "family-based commercial fishing businesses associated with residential use, small-scale fishing support and fish processing operations may be allowed, subject to compliance with the applicable land use, treaty rights and resource protection guidelines." Included among the permitted activities are "cleaning, gutting, heading, and icing or

freezing of fish that [are] caught by the family-based commercial fishing business." The fishing must occur from a lawful parcel contiguous with the Columbia River. There must be a dwelling on that parcel, and only residents of that dwelling may participate in the fishing operation.

Petitioners contend that the revised management plan violates the Act because "cleaning, gutting, heading, and icing or freezing of fish" is an "industrial use" within the meaning of the commission's own definition of the term because it involves the storage, handling, and distribution of raw materials, *i.e.*, fish.

The commission responds that permitting small-scale, family-run fishing operations does not permit "industrial use" outside of urban areas within the meaning of the revised management plan. The commission notes that the definition of the term contains the express qualification that the listed activities must be the *primary* use of the affected land or water. In this case, the commission notes, its guidelines and policies with respect to small-scale fishing support and fish processing were carefully crafted to permit such activity only when it is incidental to the use of the property, and not when it is the primary use of the property.

Petitioners reply first by contesting the commission's assertion that small-scale fishing support and fish processing are not "industrial uses" within the meaning of the plan itself. They acknowledge the qualifier that such use must be the "primary" use of the land or water. But they insist that, literally speaking, "that requires an inquiry into what happens on the land where the use is occurring, not what happens on the surrounding parcel." According to petitioners, regardless of what occurs on the balance of a given parcel on which small-scale fishing support and fish processing occur, the portion of the parcel on which that activity occurs is devoted primarily to that activity. In the alternative, petitioners contend, to the extent that small-scale fishing support and fish processing is not "industrial use" within the meaning of the plan itself, the plan violates the Act, because such activity plainly constitutes "industrial development" within the meaning of the Act.

■ We begin with whether small-scale fishing support and fish processing constitute "industrial uses" within the meaning of the term as defined in the revised management plan because, if it is, petitioners prevail and we need go no further in our analysis of the parties' contentions. In construing the plan itself, we are mindful of the federal rules governing the interpretation of agency regulations. In particular, we note the rule that an agency's construction of its own regulation ordinarily is controlling unless it is "plainly erroneous or inconsistent with the regulation." *Auer v. Robbins*, 519 US 452, 461, 117 S Ct 905, 137 L Ed 2d 79 (1997); *see also Martin v. OSHRC*, 499 US 144, 150, 111 S Ct 1171, 113 L Ed 2d 117 (1991) ("It is well established that an agency's construction of its own regulations is entitled to substantial deference." (Internal quotation marks omitted.)); *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119 (1994) (under Oregon law, courts will defer to an agency's construction of its own rule as long as the construction is plausible and not inconsistent with the rule itself, the context of the rule, or any other source of law).

In this case, petitioners do not address whether the commission's interpretation of its own definition is reasonable; they simply assert their own interpretation of it. That is not what the law requires. Aside from that, petitioners' own proposed interpretation of the definition is strained, at best. The revised management plan defines "industrial use" in terms of whether land or water is "primarily involved in" certain listed activities. According to petitioners, the portion of land or water devoted to the activity certainly is "primarily" involved with that activity, even if the balance of the land is not. The problem with that assertion is that it has the effect of rendering the word "primarily" meaningless, because *any time* one of the listed activities occurs the portion of the land on which it occurs will be primarily used for that activity.

That leaves petitioners' contention that, if small-scale fishing support and fish processing are not "industrial uses" under the definition of the term in the revised management plan, then the plan's definition of the term itself is contrary to the Act. Petitioners do not explain how, as a matter of statutory construction, they arrive at that conclusion, much

less why the commission's definition of the term is not entitled to deference under *Chevron*. The fact is that Congress commonly defines terms and concepts in terms of "primary" activities. *See, e.g.*, 7 USC § 2009cc(15) (defining "smaller enterprise" as a rural business that, among other things, satisfies standard industrial classification size standards for the industry in which the business is "primarily engaged"); 29 USC § 158(f) (identifying exceptions from certain provisions of the National Labor Relations Acts for employers "engaged primarily in the building and construction industry"); 42 USC § 5318(r) (prohibiting discrimination in urban development action grant applications on the basis of the applicant's activity "whether such activity is primarily housing, industrial, or commercial"); 46 USC § 12118(a)(1)(D) (defining a "Bowaters corporation" as a corporation, among other things, "engaged primarily in a manufacturing or mineral industry in the United States"). Under the circumstances, we do not understand why it was not at least reasonable for the commission to define the statutory term "industrial development" in terms of the primary use occurring in a particular area.

Petitioners also contend that the provisions of the revised management plan pertaining to fish processing and related activities unlawfully permit those activities to occur in lands designated "Residential," "Small Woodland," and "Small-Scale Agricultural." According to petitioners, the Act prohibits such areas from being converted to industrial uses. The problem with that argument is that it assumes the matter in contention—that is, whether the permitted use is, in fact, "industrial" use or development; as we have explained, it is not. We reject petitioners' assignment of error 9.

14. *Assignment of error 10*

As we have noted, the Act requires the commission to develop land use designations, which must designate— among other things—"areas in the scenic area outside special management areas used or suitable for commercial development." 16 USC § 544d(b)(5). The Act further requires that such designations

"shall encourage, but not require, commercial development to take place in urban areas and shall take into account the

physical characteristics of the areas in question and their geographic proximity to transportation, commercial, and industrial facilities and other amenities."

16 USC § 544d(b)(5). The Act also requires that the management plan include provisions to require that commercial development outside urban areas not adversely affect the scenic area. 16 USC § 544d(d)(7).

■ The revised management plan recognizes a category of uses that it denominates "commercial events." Such events include "weddings, receptions, parties and other small-scale gatherings that are incidental and subordinate to the primary use on a parcel." The revised management plan allows such uses to occur in the GMAs, except on lands designated Open Space or Commercial Forest.

In their assignment of error 10, petitioners contend that the commercial events provisions of the revised management plan violate the Act because they permit commercial uses outside of areas designated for commercial use and because allowing such events to occur in the scenic area outside of urban areas "improperly allows adverse effects to these lands and the conversion of these lands to commercial uses."

The commission responds that petitioners' principal contention rests on a false premise—that the Act requires all commercial uses to occur only in commercial zones. To the contrary, the commission argues, the Act requires only that commercial use take place on lands suitable for commercial development and without adversely affecting scenic area resources.

We agree with the commission. The Act requires the commission to designate areas that are suitable for commercial development, but it does not require that all commercial uses must be confined to those areas. Instead, the Act provides that the commission's designation "shall encourage, but not require," commercial development to take place in urban areas. 16 USC § 544d(b)(5). The only other statutory requirement is that the revised management plan require that commercial development outside urban areas take place without adversely affecting the resources of the scenic area.

16 USC § 544d(d)(7). Petitioners assert that, under the revised management plan, it is possible that permitting commercial events outside urban areas will adversely affect the scenic area because of access, parking, and the construction of temporary structures that could be allowed for such events. But, as we have noted with respect to petitioners' similar arguments in support of other assignments of error, it is not sufficient for petitioners to demonstrate the *possibility* of adverse effects in order to meet their burden in this case. We reject assignment of error 10.

15. *Assignment of error 13*

In their final assignment of error, petitioners contend that the revised management plan unlawfully allows the expansion of existing industrial uses throughout the scenic area. The original management plan, in a provision denominated "GMA Existing Uses Guideline 5," provided that "[e]xisting industrial uses in the GMA may expand as necessary for successful operation on the dedicated site." The commission left that provision—renamed "GMA Existing Uses and Discontinued Uses Guideline 4.B"—unchanged in the revised management plan.

Petitioners contend that permitting expansion of existing industrial uses violates the requirement in the Act that the management plan "prohibit industrial development in the scenic area outside urban areas," 16 USC § 544d(d)(6). The commission's sole response to that contention is that the matter should be regarded as beyond the scope of judicial review because the commission did not make any revision to the original management plan.

We agree with petitioners. As we have noted, the fact that the commission did not make a change to a provision of the original management plan does not insulate it from judicial review for compliance with the requirements of the Act. The Act does require rather categorically that the management plan include provisions to "prohibit industrial development in the scenic area outside urban areas." The provision at issue flatly contradicts that statutory requirement, by expressly *permitting* industrial development in the scenic area outside urban areas. Even under the deferential standard that *Chevron* requires, we do not understand how a

provision that expressly permits the expansion of industrial uses does not constitute permitting "industrial development" to occur. We therefore conclude that, in adopting GMA Existing Uses and Discontinued Uses Guideline 4.B, the commission erroneously interpreted a provision of law and acted outside the range of discretion delegated to it under the Act. ORS 196.115(3)(d).

ORS 196.115(3) provides that, if we conclude that the commission has erroneously interpreted a provision of law or acted outside the range of discretion delegated to it under the Act, the appropriate action is to remand "for further action under a correct interpretation of the provision of law."

Remanded for reconsideration.