Argued and submitted December 6, 2007, affirmed February 27, petition for review allowed July 2, 2008 (345 Or 94)

# FRIENDS OF THE COLUMBIA GORGE, INC.;
Collyn Baldwin; Claudia Curran;
Beverly Klock; Clair Klock; Eric Lichtenthaler;
Phil Pizanelli; Dixie Stevens;
Kimberlee Thorsell; Peter Thorsell;
Brian Winter; and Cynthia Winter,
*Petitioners,*

*v.*

# COLUMBIA RIVER GORGE COMMISSION,
*Respondent.*

Columbia River Gorge Commission
PA0502; A131299

179 P3d 706

Gary K. Kahn argued the cause for petitioners. With him on the briefs was Reeves, Kahn & Hennessy.

Jeffrey B. Litwak argued the cause and filed the brief for respondent.

Before Landau, Presiding Judge, and Brewer, Chief Judge, and Carson, Senior Judge.

LANDAU, P. J.

## LANDAU, P. J.

The Columbia River Gorge Commission amended its management plan for the Columbia River Gorge National Scenic Area to allow certain commercial uses on historic properties throughout the Scenic Area. Petitioners seek judicial review of that decision, arguing that the plan amendment is invalid. We affirm.

## I. BACKGROUND

We begin with an overview of the governing legal framework and the facts leading to this review. Unless otherwise indicated, the facts that we describe are not in dispute.

### A. *Regulatory framework*

The Columbia River Gorge National Scenic Area Act, 16 USC §§ 544-544p, established the Columbia River Gorge National Scenic Area in 1986. The Act has two stated purposes: (1) "to establish a national scenic area to protect and provide for the enhancement of the scenic, cultural, recreational, and natural resources of the Columbia River Gorge" and (2) "to protect and support the economy of the Columbia River Gorge area by encouraging growth to occur in existing urban areas and by allowing future economic development in a manner that is consistent" with the first purpose. 16 USC § 544a.

The Act authorized the states of Oregon and Washington to enter into an interstate agreement to establish a regional agency, the Columbia River Gorge Commission, to carry out the responsibilities of the Act. 16 USC § 544c(a)(1)(A). The Act required the commission to adopt a management plan for the Scenic Area within three years of the Act's taking effect. 16 USC § 544d(c). The Act also provides that, "[n]o sooner than five years after adoption of the management plan, but at least every ten years, the Commission shall review the management plan to determine whether it should be revised." 16 USC § 544d(g).

The Act also provides that the commission may amend the management plan outside of the "usual" revision cycle:

 *"If the Commission determines at any time that conditions within the scenic area have significantly changed, it may amend the management plan.* The Commission shall submit amendments to the management plan to the Secretary [of Agriculture] for review, in accordance with the provisions of this section for adoption of the management plan."

16 USC § 544d(h) (emphasis added). The commission adopted an administrative rule setting forth additional requirements for amending the plan, which provides, in part:

"The Commission must find the following criteria are satisfied before it approves an amendment to the Management Plan:

"(1) Conditions in the Scenic Area have significantly changed. This means:

"(a) Physical changes that have widespread or major impacts to the landforms, resources, or land use patterns in the Scenic Area;

"(b) *New information or inventory data regarding land uses or resources that could result in a change of a plan designation, classification, or other plan provision;* or

"(c) Changes in legal, social, or economic conditions, including those that affect public health, safety, or welfare, not anticipated in the Management Plan.

"(2) No practicable alternative to the proposed amendment more consistent with the purposes and standards of the Scenic Area Act exists; and

"(3) The proposed amendment is consistent with the purposes and standards of the Scenic Area Act."

OAR 350-050-0030 (Nov 15, 1999) (emphasis added).

B. *The original and revised management plans*

 In 1991, the commission adopted a management plan for the Scenic Area. Although "cultural resources" are protected under the Act, the term is not defined in the Act. The commission, however, defined the term in its management plan as "[e]vidence of human occupation or activity that is important in the history, architecture, archaeology or culture of a community or region * * * includ[ing] * * * [h]istoric

buildings and structures * * * that are at least 50 years old." The management plan also provides that significant cultural resources are those that are, among other things, "included in, or eligible for inclusion in, the National Register of Historic Places."

In 2001, as required by the Act, the commission began a process to revise the management plan. During its plan review, the commission considered further refining the plan's provisions relating to historic properties. Due to budget constraints, the commission deferred taking any action with regard to that issue, noting that it could be raised as an amendment to the plan. The commission issued the revised management plan in 2004. Shortly after that, Friends of the Columbia Gorge, Inc., joined by a number of other petitioners, challenged the validity of the revised management plan. In *Friends of Columbia Gorge v. Columbia River Gorge*, 215 Or App 557, 559, 605-06, 171 P3d 942 (2007) (*Friends of Columbia Gorge I*), we upheld the validity of the revised management plan in most of the challenged respects, but remanded for the commission to reconsider the portion of the revised plan that concerns expansion of industrial uses in the general management areas (GMAs) of the Scenic Area that are subject to the Act.

## C. *The disputed management plan amendment*

In the meantime, in 2005, the owner of the Viewpoint Inn, a historic property in the Scenic Area that had closed some 40 years earlier, proposed an amendment to the management plan that would allow him to reopen the inn and restaurant. The property is listed on the National Register of Historic Places. The applicant's proposed amendment would allow historic properties in the Scenic Area that were listed on the National Register before November 17, 1986, to operate commercially if that was the property's historic use. The purpose of the proposal was to allow the Viewpoint Inn to generate enough revenue to support its restoration by allowing "adaptive reuse" of the historic property.

As proposed, the plan amendment would apply only to the Viewpoint Inn. The commission, however, decided to address the broader issue raised by the proposal—that is,

how well the management plan supports the protection and enhancement of historic properties.

The commission staff began by gathering information from various sources about current and allowable uses of historic properties under the current management plan provisions and by compiling information regarding the extent to which those provisions have protected and enhanced the Scenic Area's historic properties. The commission staff hired a historic preservation expert, Donovan & Associates, to complete a survey of historic properties in the Scenic Area. The survey included an examination of nearly 800 properties located in the Scenic Area to determine whether there existed properties that were eligible or potentially eligible for listing on the National Register but were not currently protected. In brief, the survey reported that, of those 800 properties, 18 were eligible for listing, 36 were potentially eligible for listing, and 179 others might also be eligible, depending on additional information that was not currently available. The commission staff consulted with the United States Forest Service, the states of Oregon and Washington, Scenic Area counties, Scenic Area tribal governments, the National Trust for Historic Preservation and other agencies with expertise in historic preservation, and jurisdictions outside the Scenic Area administering successful historic preservation programs. The commission staff also solicited public testimony.

In response to that information, the commission staff recommended modifications to the management plan amendment originally proposed by the owner of the Viewpoint Inn to address what it considered to be the broader problem of underprotection of cultural resources, such as historic properties, in the Scenic Area. In brief, the commission staff found that the current management plan did not adequately protect those resources because current regulations concerning the use of such properties are so restrictive as to make rehabilitation and maintenance of those properties economically infeasible. Commission staff found that other jurisdictions had more successfully promoted restoration and maintenance of historic properties by adopting a policy of "adaptive uses" and "preservation incentives."

Accordingly, the commission staff recommended a new cultural resources policy for the management plan: "Provide incentives to protect and enhance historically significant buildings by allowing uses of such buildings that are compatible with their historic character and that provide public appreciation and enjoyment of them as cultural resources." The substantive provisions of the staff's recommendation broaden the initial proposal by allowing certain commercial uses of historic properties throughout the Scenic Area. Those provisions include, in part:

"1. Properties in all GMA land use designations except Open Space and Agriculture-Special with buildings included on the National Register of Historic Places shall be permitted to be open for public viewing, interpretive displays, and an associated gift shop that is no larger than 100 square feet and incidental and subordinate to the primary use of the property, subject to compliance with the applicable guidelines to protect scenic, cultural, natural and recreation resources * * *.

"2. Properties in all GMA land use designations except Open Space and Agriculture-Special with buildings included on the National Register of Historic Places, and which were former restaurants and/or inns shall be permitted to re-establish these former uses, subject to compliance with the applicable guidelines to protect scenic, cultural, natural and recreation resources * * *.

"3. Properties in all GMA land use designations except Open Space and Agriculture-Special with buildings included on the National Register of Historic Places shall be permitted to hold commercial events, subject to compliance with the applicable guidelines to protect scenic, cultural, natural and recreation resources * * *.

"4. The following additional review uses may be allowed in all GMA land use designations except Open Space and Agriculture-Special on a property with a building either on or eligible for the National Register for Historic Places and that was 50 years old or older as of January 1, 2006, subject to compliance with the applicable guidelines to protect scenic, cultural, natural and recreation resources * * *:

"A. Establishments selling food and/or beverages, limited to historic buildings that originally had kitchen facilities.

The seating capacity of such establishments shall be limited to the building, as the building existed as of January 1, 2006, including any decks, terraces or patios also existing as of that date. Banquets, private parties and other special events that take place entirely within approved establishments selling food and/or beverages shall be considered a part of the approved use.

"B. Overnight accommodations. The room capacity of such accommodations shall be limited to the total number of existing rooms in the historic building as of January 1, 2006.

"C. Commercial events in the building or on the subject property, incidental and subordinate to the primary use of the property[.]

"D. Wineries upon a showing that processing of wine is from grapes grown on the subject parcel or the local region, within a historic building, as the building existed as of January 1, 2006.

"E. Sales/tasting rooms in conjunction with an on-site winery, within a historic building, as the building existed as of January 1, 2006.

"F. Conference and/or retreat facilities within a historic building, as the building existed as of January 1, 2006.

"G. Artist studios and galleries within a historic building, as the building existed as of January 1, 2006.

"H. Gift shops within a historic building, as the building existed as of January 1, 2006 * * *.

"I. Interpretive displays, picnic areas or other recreational day use activities on the subject property.

"J. Parking areas on the subject property to support any of the above uses.

"* * * * *

"6. Uses 3 and 4.C are not subject to the 'Commercial Events' provisions in Part II, Chapter 7 of the Management Plan. Commercial events at historic properties will be regulated by the guidelines contained in this section. * * *

"7. Uses 1 and 4.I are not subject to the parking limits and associated 'Facility Design Guidelines' in the Recreation Intensity Classes."

The staff recommendation also provides the procedure by which adaptive uses of historic properties are approved and requires that adaptive uses be reviewed every five years. It also adds additional guidelines to the management plan that apply specifically to adaptive uses of historic properties.

On December 13, 2005, the commission issued a final order approving the staff recommendation and amending the management plan accordingly. The 20-page, single-spaced order sets forth the commission's findings of fact and legal conclusions with regard to each of the criteria in the Act and its own administrative rule governing amendments to the management plan.

In brief, the commission first found that conditions in the Scenic Area have changed significantly, based on the information that commission staff collected, including the Donovan & Associates inventory, staff-generated information concerning the allowable uses of historic properties in the provisions of the current management plan, and information received during the commission's recently completed 10-year plan review process. Based on that information, the commission found that some significant historic properties in the Scenic Area "are deteriorating and are in need of stabilization to protect the resource" and that other such properties "either have been adversely affected by incompatible alterations or have been lost altogether, due to deterioration or demolition." The commission found that rehabilitation and restoration of historic properties has become very costly and that many current owners simply are not willing to spend the money out of their own pockets to make repairs. And the commission found that permitting additional uses of historic properties will provide economic incentives for the rehabilitation and maintenance of those properties.

Second, the commission found that there are no practicable alternatives that are more consistent with the Act. Those alternatives included the initial plan amendment proposed by the owner of the Viewpoint Inn; leaving the plan's historic properties provisions unchanged; approving the Viewpoint Inn application and entertaining other requests for consideration on a case-by-case basis; a proposal of Friends of the Columbia Gorge to limit adaptive uses to

properties actually listed on the National Register, subject to numerous size and scope limitations; and limiting adaptive use of historic properties in the general management areas to reestablishment of the original historic uses only.

Finally, the commission found that the staff recommendation was consistent with the purposes and standards of the Act.

On February 10, 2006, petitioners—Friends of the Columbia Gorge and several Scenic Area residents—filed this petition for judicial review of the plan amendment.

## II. ANALYSIS

On judicial review, petitioners challenge each of the three essential findings of the commission's final order, arguing that the commission erred in concluding that the requirements of the Act and the commission's own rules concerning plan amendments were satisfied. Specifically, petitioners first contend that the commission erred in finding that conditions in the Scenic Area have significantly changed. Second, they contend that the commission failed to consider and reject *all* practicable alternatives as less consistent with the Act. Third, they contend that, in general, the amendment that the commission approved is inconsistent with the requirements of the Act.

A. *Whether conditions in the Scenic Area have "significantly changed"*

As we have noted, the Act permits the commission to amend the management plan "[i]f the Commission determines at any time that conditions within the scenic area have significantly changed." 16 USC § 544d(h). As we have also noted, although the Act does not define "significantly changed," the commission has adopted its own administrative rule to provide a definition of that term. That rule defines "significantly changed" to include, among other things, "[n]ew information or inventory data regarding land uses or resources that could result in a change of a plan designation, classification, or other plan provision." OAR 350-050-0030(1)(b) (Nov 15, 1999).

In this case, petitioners argue that the commission erred in finding that conditions in the Scenic Area have significantly changed. Their arguments are not entirely clear to us, but, as we understand them, they reduce to essentially two assertions. First, petitioners contend that the information on which the commission relied was not "new" information within the meaning of the rule. Second, they contend that the commission erred in finding that the information revealed a change in circumstances that was "significant" within the meaning of the Act.

Thus framed, petitioners' arguments require a brief digression to describe the applicable standards of review. ORS 196.115(2)(a) provides that a final action or order of the commission is subject to review as an order in a contested case under the state Administrative Procedures Act, ORS 183.482. ORS 196.115 further provides that, in reviewing such an order,

"(c) [t]he court may affirm, reverse or remand the order. If the court finds that the agency has erroneously interpreted a provision of law and that a correct interpretation compels a particular action, the court shall:

"(A) Set aside or modify the order; or

"(B) Remand the case to the agency for further action under a correct interpretation of the provision of law.

"(d) The court shall remand the order to the agency if the court finds the agency's exercise of discretion to be:

"(A) Outside the range of discretion delegated to the agency by law;

"(B) Inconsistent with an agency rule, an officially stated agency position or a prior agency practice, unless the inconsistency is explained by the agency; or

"(C) Otherwise in violation of a constitutional or statutory provision.

"(e) The court shall set aside or remand the order if the court finds that the order is not supported by substantial evidence in the whole record."

ORS 196.115(3). In this case, petitioners broadly contend that all the foregoing standards apply.[1] Frankly, such a broad contention is not particularly helpful. Simply to assert that various standards of review apply to an issue, without more, gives no guidance and is not persuasive advocacy. What is needed is not just a laundry list of potentially applicable standards of review, but an articulation of how a particular standard of review applies to each argument and then a framing of the argument in light of that standard of review.

In this case, as we have noted, petitioners' arguments reduce to two propositions. The first is that the commission failed correctly to apply the administrative rule that defines the statutory term "significantly changed" to include "new information or inventory data." As such, that argument consists of an assertion that the commission "erroneously interpreted a provision of law." ORS 196.115(3)(c). As we noted in *Friends of Columbia Gorge I*, 215 Or App at 568-71, depending on what sort of "provision of law" is involved, different standards of deference to an agency's interpretation of that law come into play. When the argument is that the agency misinterpreted *its own* administrative rule, both federal and state interpretive principles require courts to afford the agency a great deal of deference. In essence, the agency's construction will be upheld as long as it is reasonable and not inconsistent with the text of the rule or any other applicable source of law. *Auer v. Robbins*, 519 US 452, 461, 117 S Ct 905, 137 L Ed 2d 79 (1997) (federal agency construction of agency's own rule is entitled to deference); *see also Martin v. OSHRC*, 499 US 144, 150, 111 S Ct 1171, 113 L Ed 2d 117 (1991) ("It is well established that an agency's construction of its own regulations is entitled to substantial deference." (Internal quotation marks omitted.)); *Don't Waste Oregon Com. v. Energy Facility Siting*, 320 Or 132, 142, 881 P2d 119

---

[1] Petitioners assert that

"[t]he Commission's decision should be reviewed for a determination of whether the Commission erroneously interpreted a provision of law, whether the Commission acted outside the range of discretion delegated to it by law, whether the Commission's action is supported by substantial evidence in the whole record, whether the Commission acted inconsistent[ly] with an agency rule, and whether the Commission acted otherwise in violation of a statutory provision."

(1994) (under Oregon law, agency construction of its own rule is entitled to deference).

■ Petitioners' second assertion is that the commission erred in concluding that any of the new information on which it relied was sufficiently "significant" to justify the amendment. The argument, in other words, is that the commission erred in finding that the *quantum* of new information was sufficient to justify its decision to adopt the amendment. That is a finding of fact. *See Caterpillar Inc. v. Sturman Industries*, 387 F3d 1358, 1377-78 (Fed Cir 2004), *cert den*, 545 US 1114 (2005) (whether a contribution to a claimed patent was "not significant" presents a question of fact); *State v. Howe*, 198 Or App 568, 570, 571, 109 P3d 391 (2005) (stating that whether the loss or harm caused by the defendant's crime was "significantly" greater than typical for such a crime is a factual finding). Under ORS 196.115(2)(e), we review such findings of fact for substantial evidence. "Substantial evidence" is evidence that a reasonable person would find adequate to support a finding after considering the record as a whole. ORS 183.482(8)(c). With those standards of review in mind, we turn to petitioners' arguments.

1. *Whether the commission relied on "new" information*

■ Petitioners first contend that the commission erred in concluding that there existed the necessary "new information" to justify a plan amendment. As we noted, in its final order, the commission identified a number of sources of the information on which it based its decision, including the 2005 Donovan & Associates survey, commission staff-generated information concerning the allowable uses for historic properties in the existing provisions of the management plan, and information received during the recently completed 10-year review process. According to petitioners, none of that information is "new" information within the meaning of the commission's rule. Petitioners contend that, for example, much of the information contained within the Donovan & Associates survey—specifically, that some historic properties are deteriorating and in need of repair and that maintenance of historic properties is costly—is "common knowledge" and cannot fairly be characterized as "new" information. In a similar

vein, petitioners contend that the staff-generated information was merely a rehash of existing information.

The commission responds that, whether the information was newly *created*, it considers "new" information to encompass information that is new to the commission. The commission contends that petitioners read the term "new" too narrowly and without regard to the deference to which the commission's own interpretation is entitled. The ordinary meaning of the term, the commission contends, embraces information that is merely not old or out of date. Thus, the commission concludes, its interpretation of the term is plausible and, as such, controlling.

We agree with the commission. As we stated at the outset of this discussion, the key to our disposition of the argument is our standard of review. Because the issue concerns the commission's construction of its own administrative rule, we will defer to that construction so long as it is not "plainly erroneous or inconsistent with the regulation." *Auer*, 519 US at 461.

In this case, the pertinent provision of the rule states that certain "new information or inventory data regarding land uses" can constitute a requisite "significant change" sufficient to warrant an amendment to the management plan. In ordinary parlance, "new" refers to "having existed or having been made but a short time : having originated or occurred lately : not early or long in being * * * having been seen or known but a short time although perhaps existing before * * * being other than the former or old." *Webster's Third New Int'l Dictionary* 1522 (unabridged ed 2002). Petitioners do not explain, and we do not understand, why the commission's interpretation of its administrative rule in this case is in any way plainly erroneous or inconsistent with the foregoing range of meanings.[2] They simply assert, *ipse dixit*, that the commission should not be permitted to rely on the

---

[2] In their reply brief, petitioners do assert that the commission's interpretation of its own rule is inconsistent with the first of the definitions listed in *Webster's*, which petitioners assert is the "primary definition" of the word and thus to be preferred. Petitioners do not explain, however, precisely how the commission's interpretation conflicts with the first of those listed definitions. Aside from that, the fact is that *Webster's* does not list its definitions in order of usage preference, but rather in order of historical usage. *Webster's* at 17a, note 12.5.

information that it relied on because the information was not generated "for the purposes of the challenged decision." We reject petitioner's contention without further discussion.

2. *Whether the information demonstrated a "significant" change*

■ Petitioners next complain that, even if the information was "new," it was not sufficiently significant to justify the commission's adoption of the plan amendment. According to petitioners, the information on which the commission relied "does not indicate a widespread problem of historic buildings that have not been protected." Petitioners take particular umbrage at the commission's reading of the Donovan & Associates survey, which, they contend, "actually shows that historic buildings in the Gorge are generally in better shape than one would expect." In petitioners' view, existing programs for landowner education and tax incentives are sufficient to protect historic properties.

The commission responds that petitioners are reading the record too selectively. For example, the commission points out that the Donovan & Associates survey says only that *houses* are generally in good condition, not that other historic properties—such as grange halls, schools, agricultural farm complexes, and other properties—are in the same condition. The commission further notes that the record—including the consultation of commission staff with 15 other governments that allow adaptive use of historic properties, as well as input from tribal governments, historic preservation officers of two states, and its own experience of 20 years of regulating historic properties in the Scenic Area—more than adequately supports its findings that existing management plan provisions are not adequate to protect historic properties in the Scenic Area.

We again agree with the commission. And, once again, the standard of review is dispositive. As we have noted, the challenged decision is a finding of fact, which we review for substantial evidence. Thus, we are not at liberty to peruse the record for evidence that might support a contrary finding, as petitioners propose. The question before us is not whether the record reasonably could support the findings that petitioners believe that the commission should have made but, instead, whether the record reasonably supports

the findings that the commission actually made. Petitioners never explain why the record is legally insufficient in light of that standard. They assert that their own reading of the record leads them to find that there have been no significant changes in the Scenic Area with respect to the preservation of historic properties. That simply is not what the law requires to justify the reversal that they seek.

## B. *Availability of practicable alternatives*

The commission's administrative rule provides that, before approving a plan amendment, it must determine that "[n]o practicable alternative to the proposed amendment more consistent with the purposes and standards of the Scenic Area Act exists." OAR 350-050-0030(2) (Nov 15, 1999). Petitioners contend that the commission erred in finding that no such practicable alternatives to the amendment that it approved exist. According to petitioners, there are numerous alternatives that the commission did not consider at all. For example, petitioners contend that the commission could have considered reducing the scope of the amendment by eliminating specific categories of uses that are most likely to adversely affect other resources in the Scenic Area; petitioners list restaurants, hotels, and commercial event and retreat facilities as examples. In addition, petitioners contend, the commission failed to consider "alternative, small-scale" changes to the management plan that might generate revenue for the renovation of historic properties, but with less intensive impacts. In a similar vein, petitioners suggest that the commission could have considered imposing mitigation requirements such as limiting the size of commercial parking areas and requiring such areas to be fully screened with vegetation from key viewing areas. Finally, petitioners argue, the commission could have considered more fully the extent to which existing historic preservation tax incentive programs suffice to protect historic properties in the Scenic Area.

The commission responds that it did not fail to consider other alternatives; it rejected them. In any event, the commission argues, its rule does not require it to consider and reject every single imaginable alternative to a proposed plan amendment that parties may develop.

To dispose of the parties' arguments once again requires us to evaluate the commission's interpretation of its

own rule. As we have noted, that means that we will affirm the commission's interpretation if it is neither plainly erroneous nor inconsistent with the wording of the rule or with any other applicable source of law. *Auer*, 519 US at 461. In this case, the administrative rule itself does not define the phrase "practicable alternative." The management plan does include a definition of the word "practicable," however. The plan defines that word to mean "[a]ble to be done, considering technology and cost." Moreover, the term "practicable alternatives" and the requirement that an agency consider them in its decision-making processes is common in federal environmental regulation and has acquired a consistent and well-understood meaning. Courts construing the requirement to consider "practicable alternatives" in those other contexts consistently conclude that it does not obligate an agency to consider each and every imaginable alternative. Rather, the requirement is regarded as obligating the agency to exercise some measure of discretion, which exercise will be upheld so long as it appears reasonable in light of the record of each case.

The Clean Water Act, 33 USC §§ 1251-1387, for example, prohibits the discharge of pollution into waterways without first obtaining a permit. 33 USC § 1342(a). The regulations implementing that Act provide criteria for issuing a permit, including that "no discharge of dredged or fill material shall be permitted if there is a *practicable alternative* to the proposed discharge which would have less adverse impact on the aquatic ecosystem." 40 CFR § 230.10(a) (July 1, 2006) (emphasis added). That administrative rule defines a practicable alternative as one that is "available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 CFR § 230.10(a)(2) (July 1, 2006). Courts interpreting that requirement have concluded that it does not require the implementing agency to exhaust every single imaginable alternative, only that the agency act reasonably under the circumstances. *See, e.g., Bering Strait Citizens v. U.S. Army Corps, Engin.*, 511 F3d 1011, 1021 (9th Cir 2008) (affirming the Corps' decision because the Corps "reasonably reviewed the feasible options and reasonably concluded that the proposed design was the best design alternative"); *Great Rivers*

*Habitat v. U.S. Army Corps of Enginr.*, 437 F Supp 2d 1019, 1030 (ED Mo 2006) (determining that the Corps' conclusion that no practicable alternatives existed was neither an abuse of its discretion nor a violation of the law because the Corps "considered and rejected proposed practicable alternative sites in accordance with its duties under the law and articulated reasons for its decision as to practicable alternatives").

A closely analogous "reasonable alternatives" requirement is employed by the guidelines for the National Environmental Policy Act (NEPA), 42 USC §§ 4321-4370f. 42 USC § 4332(2)(C) (requiring "a detailed statement by the responsible official on * * * alternatives to the proposed action"); 40 CFR § 1502.14(a) (July 1, 2007) (providing that agencies shall "[r]igorously explore and objectively evaluate all reasonable alternatives"). In that context, courts have noted that an agency's consideration of alternatives is not lacking "simply because the agency failed to include every alternative device and thought conceivable by the mind of man." *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 US 519, 551, 98 S Ct 1197, 55 L Ed 2d 460 (1978); *accord Laguna Greenbelt, Inc. v. U.S. Dept. of Transp.*, 42 F3d 517, 524-25 (9th Cir 1994) (noting that, to comply with NEPA's no-reasonable-alternatives requirement, an agency need "not consider every conceivable alternative * * * nor remote and speculative alternatives whose effects cannot be readily ascertained") (citing *Vermont Yankee Nuclear Power Corp.*, 435 US at 551).

In this case, the commission has interpreted its own administrative rule to apply much like the courts have interpreted similar provisions in related contexts; that is to say, it has interpreted the rule not to require it to consider and reject each and every conceivable alternative to the plan amendment before it, but only those that it regards as reasonably practicable, taking into account available technology and cost. Particularly in light of the body of law with respect to similar provisions in other statutory contexts, we cannot say that the commission's interpretation is plainly erroneous or contrary to the wording of the rule or any other source of law.

With the foregoing in mind, we readily conclude that the commission's final order passes muster. As we have noted, the final order evaluated each of five alternatives that the commission regarded as practicable. In each case, the commission rejected the alternatives with a careful and detailed explanation. Petitioners contend that the final order is nevertheless too general and not sufficiently detailed, but they do not explain why—even assuming that to be true—that renders the order unreasonable. Petitioners further contend that they have identified a number of alternatives that the commission could have evaluated, but did not. That may be so, but it does not follow that, merely because petitioners can imagine other alternatives that the commission could have evaluated, the commission's order consequently is invalid. Once again, under the applicable standard of review, the determinative question is not whether it would have been reasonable for the commission to have done more. The question is whether it was reasonable for the commission to have done what it did. We readily answer that question in the affirmative.

C. *Consistency of the amendment with the purposes and standards of the Act*

Alternatively, petitioners argue that, even if the commission did not violate its own rule in approving the plan amendment, it violated the Act itself. According to petitioners, the commission's approval of the plan amendment violates the Act because it allows commercial uses in areas outside urban areas and commercial zones in the general management areas; because it creates the possibility of allowing adverse effects to protected resources in the Scenic Area; because the portions of the amendment pertaining to commercial events on historic properties include no size and scope limitations; because the commission failed adequately to consider cumulative impacts of the amendment; and because the plan amendment fails to accomplish its stated purpose of protecting cultural resources such as historic properties.

Thus framed, petitioners' arguments take on the nature of a facial challenge to the validity of the plan amendment. In *Friends of Columbia Gorge I*, we held that, in such

cases, petitioners must demonstrate that the plan amendment "cannot be applied consistently with the law under any circumstances." 215 Or App at 568 (citing *MacPherson v. DAS*, 340 Or 117, 138-39, 130 P3d 308 (2006)). At oral argument, petitioners complained that we erred in requiring of them such a demanding showing in *Friends of Columbia Gorge I* and that we should disavow that decision and demand less of them in this case. According to petitioners, the standard that we applied in *Friends of Columbia Gorge I* should be limited to facial *constitutional* challenges and that, in its place, we should substitute a standard that we have applied to administrative rule challenges in cases such as *City of West Linn v. LCDC*, 200 Or App 269, 275, 113 P3d 935, *rev den*, 339 Or 610 (2005); that is to say, petitioners argue, we should require only that they show that "the rule on its face affirmatively authorizes actions that violate the statutory standard."

At the outset, we note that, to the extent that petitioners are arguing that facial challenges consist only of constitutional challenges, they are simply incorrect. *See, e.g., Wolf v. Oregon Lottery Commission*, 209 Or App 670, 682, 149 P3d 303, *rev allowed*, 343 Or 115 (2006) (facial challenge to administrative rule on nonconstitutional grounds). Aside from that, and in any event, we do not understand how the standard that petitioners propose—that they must show that the challenged plan amendment "affirmatively authorizes actions that violate the statutory standard"—is different from the standard that we have articulated. If the plan amendment in this case affirmatively authorizes what the Act prohibits, then petitioners have met their burden under the standard that we have described. The point of the standard that we articulated both in *City of West Linn* and in *Friends of Columbia Gorge I*—and that we apply in this case, as well—is that, in a facial challenge, we are limited to the validity of the rule or plan amendment *as written* and are not permitted to speculate how it *might* be applied based on a variety of facts not currently before us.

■■ Petitioners' arguments about the validity of the plan amendment *vis-à-vis* the requirements of the Act also require us to determine what the Act requires in the first place. Because the Act is a federal statute, we apply the rules of

statutory construction that federal courts are required to apply to congressional enactments. *Corp. of Presiding Bishop v. City of West Linn*, 338 Or 453, 463, 111 P3d 1123 (2005). Generally, those rules require federal courts to examine the text of the enactment and its context and, if necessary, its legislative history. *See, e.g.*, *Department of Revenue of Ore. v. ACF Industries, Inc.*, 510 US 332, 339-46, 114 S Ct 843, 127 L Ed 2d 165 (1994) (following that process in an examination of a federal statute). Those rules of construction also provide that, when a federal agency is charged with enforcing a federal statute, its construction of an ambiguous provision of such a statute may be entitled to deference, so long as the agency's construction is reasonable. *Chevron U. S. A. v. Natural Res. Def. Council*, 467 US 837, 843, 845, 104 S Ct 2778, 81 L Ed 2d 694 (1984) (*Chevron*).

Petitioners take issue with the applicability of the deferential *Chevron* standard to this case. According to petitioners, *Chevron* does not apply because the commission is, strictly speaking, not a "federal agency." Petitioners have a point. The commission, actually, is neither a federal agency nor a state agency, but rather a "hybrid." *Columbia River Gorge Comm. v. Hood River County*, 210 Or App 689, 701, 152 P3d 997, *rev den*, 342 Or 727 (2007). But, as we explained in *Friends of Columbia Gorge I*, we do not understand the applicability of *Chevron* to depend on such matters of form. *Friends of Columbia Gorge I*, 215 Or App at 570-71. We noted that, in cases following *Chevron*, the United States Supreme Court has explained that whether the rule of deference applies depends on a determination of congressional intent in each case and that reliable indicators of that intent include the fact that the agency is a creation of federal law, that Congress contemplated that the agency's action will have the effect of law following some sort of formal administrative procedure, or that the agency has specialized expertise and broader information available to it. *Friends of Columbia Gorge I*, 215 Or App at 569-70 (citing *United States v. Mead Corp.*, 533 US 218, 228-31, 121 S Ct 2164, 150 L Ed 2d 292 (2001)). As we noted in *Friends of Columbia Gorge I*, all of those indicators are present in this case.

1. *Whether the plan amendment allows uses that the Act prohibits*

Petitioners first contend that the plan amendment violates the Act because it allows commercial uses and development in areas outside urban areas and commercial zones in the general management areas. As we have noted, the plan amendment allows certain commercial uses of historic properties, subject to guidelines specific to historic properties rather than the guidelines applicable generally to commercial events. Petitioners contend that allowing such uses outside of urban areas and in noncommercial zones violates the Act.

The commission responds that the Act specifies no such limit. Instead, the commission argues, the Act requires that the commission designate areas "suitable for commercial development," that is, zoning to identify lands that are suitable for *predominantly* commercial development. According to the commission, the Act does not require that those commercial zones be the exclusive locations for commercial uses and developments.

We begin by noting that it is not clear to us precisely which provision of the Act petitioners contend that the commission has violated. In their opening brief, they assert that the amendment violates the provisions of the Act that "allow[ ] commercial uses and development only in urban areas or in areas zoned for such uses." Petitioners cite two provisions as authority for that description of the Act's requirements: 16 USC § 544a(2) and 16 USC § 544d(b)(5). The problem is that neither section says what petitioners assert.

Section 544a of the Act comprises its statement of purposes. Among those purposes is the one that petitioners cite, that the Act is intended "to protect and support the economy of the Columbia River Gorge area by encouraging growth to occur in existing urban areas and by allowing future economic development in a manner that is consistent with" the goals of providing for the enhancement of scenic, cultural, recreational, and natural resources in the Scenic Area. 16 USC § 544a(2). Nowhere does that provision prohibit commercial use outside of urban areas. At best (from

petitioners' point of view), the provision may be viewed as stating that one of the purposes of the Act is to "encourage" economic development within such areas. But it also more broadly provides that economic development is to be allowed—without any express geographic limitations—as long as it is consistent with the overall purposes of the Act.

Section 544d, meanwhile, describes what must be included in the Scenic Area management plan. The specific subsection that petitioners rely on provides that the management plan must include land use designations for nonfederal land in the Scenic Area and that, among other things, the land use designations must "designate areas in the Scenic Area outside special management areas used or suitable for commercial development: *Provided*, That such designation shall encourage, but not require, commercial development to take place in urban areas." 16 USC § 544d(b)(5). Thus, contrary to petitioners' characterization of the statute, it *disclaims* requiring the commission to prohibit commercial development outside urban areas. Other provisions of the Act confirm that point. Later in the same section, in fact, the Act requires that the management plan "require commercial development *outside urban areas* [to] take place without adversely affecting the scenic, cultural, recreation, or natural resources of the scenic area." 16 USC § 544d(d)(7) (emphasis added).

Even assuming for the sake of argument that the wording of the Act were not at odds with petitioners' argument, it would be at the very least ambiguous on the point, which would trigger the deference that *Chevron* requires. Either way, petitioners have failed to identify how the plan amendment, as written, permits what the Act prohibits. Consequently, they have failed in their burden in this aspect of their facial challenge.

2. *Whether the plan amendment allows impermissible adverse effects*

As we have just noted, the Act requires "commercial development outside urban areas [to] take place without adversely affecting the scenic, cultural, recreation, or natural resources of the scenic area." 16 USC § 544d(d)(7). In turn, the Act defines "adversely affecting" to mean "a reasonable

likelihood of more than moderate adverse consequences" for the protected resources. 16 USC § 544(a). To determine whether adverse effects will occur, the Act provides that that determination is based on the context and intensity of a proposed action, the relationship between a proposed action and other similar actions, which are individually insignificant but which may have cumulatively significant impacts, and the mitigation measures that will be implemented as part of a proposed action. 16 USC § 544(a).

Petitioners contend that the plan amendment that the commission approved in this case violates the congressional admonition not to allow adverse effects to the scenic, natural, and recreational resources of the Scenic Area. Petitioners acknowledge that the plan amendment serves to promote the protection of cultural resources in the area. Their complaint is that, in doing so, the commission has "impermissibly elevated the protection and enhancement of cultural resources over the protection and enhancement of the other three resource categories" recognized by the Act. According to petitioners, the Act requires that any action taken in the pursuit of the protection of one of those four statutory resource categories not adversely affect any one of the others.

The commission responds that petitioners' contention is purely speculative. Because adaptive uses of historic properties remain subject to the Act's prohibition against adverse effects, the commission argues, petitioners could bring an as-applied challenge to the plan amendment if, at some point in the future, the commission approves a use that adversely affects other resources.

We agree with the commission that petitioners' contention is purely speculative. To begin with, once again, we are at a loss to understand the statutory basis for petitioners' argument. Petitioners cite 16 USC § 544a(1), but, as we have noted, that is the portion of the statute that simply states its general purpose and provides that its purpose includes protecting and enhancing "scenic, cultural, recreational, and natural resources" in the Scenic Area. Petitioners also cite 16 USC § 544d(d), but, again, that provision merely requires the commission to adopt a management plan that protects the four resources that are described in section 544a.

Aside from that, the "adverse effects" that the Act prohibits are statutorily defined to take into account the context of a specific, proposed action, the intensity of the proposed action, and any mitigating measures that the commission may require to reduce otherwise significant adverse effects. It is, in other words, action-specific and depends on the facts of each case.

In that context, it becomes clear that petitioners' challenge in this respect is indeed speculative. It does not rest on the fact that the plan amendment, as written, permits what the Act prohibits; rather, it is premised on an assertion that it is *possible* that the plan amendment could, *at some time in the future*, be invoked to permit actions that *could* adversely affect the resources that the Act requires the commission to protect. As such, petitioners' contention is not ripe for judicial review, and we reject it without further discussion. *See Friends of Columbia Gorge I*, 215 Or App at 575-77 (rejecting similar challenges to the lawfulness of the revised management plan as not ripe).

3. *Whether the plan amendment fails to include required size and scope limitations*

■ Petitioners also contend that the plan amendment that the commission approved violates the Act because the guidelines pertaining to commercial events on historic properties include no specific size and scope limitations. In this case, petitioners do not contend that the Act requires such specific size and scope limitations. They rely instead on the fact that, before the commission adopted the plan amendment, the management plan limited all commercial events to no more than 100 guests with no more than 50 vehicles and contained an annual cap of 18 day-long events for each property. The historic properties plan amendment exempts a commercial event occurring on a historic property from those specific limitations. Instead, a commercial event occurring on a historic property is subject to new guidelines specific to adaptive uses that, among other things, require that the commercial event be "incidental and subordinate to the primary use of the property." According to petitioners, the plan

amendment's deviation from specific size and scope limitations violates the Act because they are a "far cry from the specific limits that the Commission determined in 2004 were necessary to comply with the Scenic Area Act" and because the commission did not explain its dramatic change to "less protective guidelines."

The commission responds that it never determined that those specific limitations were *necessary* to comply with the Act. It contends that, because it determined that an individualized approach to commercial events on historic properties was more protective of the cultural resources than the uniform limitations already included in the management plan, its determination that the Act does not require more specific limitations is a reasonable one.

We agree with the commission. Simply because the commission previously determined that specific limitations on all commercial events were *sufficient* to meet the standards of the Act does not mean that those limitations are *necessary* for compliance with the Act. Even assuming that the commission's individualized approach is "less protective" of other resources, as petitioners allege, petitioners have failed to demonstrate that the commission's new approach violates the Act. Because the plan amendment requires that commercial events be "incidental and subordinate" to a property's primary use and that, like all adaptive uses allowed by the plan amendment, commercial events on historic properties remain subject to the Act's prohibition against adverse effects, we cannot say that the lack of specific size and scope limitations violates the Act.

4. *Whether the plan amendment fails to address cumulative impacts*

Petitioners also argue that the plan amendment violates the Act because the commission failed adequately to address, or at least adequately to consider, the cumulative impacts of the plan amendment. As we have noted, the Act provides that the management plan may allow commercial development in the general management areas that do not "adversely affect[ ]" the protected resources. 16 USC § 544d(d)(7). As provided by the Act, adverse effects include "the relationship between a proposed action and other

similar actions which are individually insignificant but which may have cumulatively significant impacts." 16 USC § 544(a)(3). Petitioners argue that the commission failed to take precautions against the cumulative impacts of the plan amendment because, under the amendment, every owner of every historic property could seek permission to host commercial events, resulting in "enormous" impacts to protected resources.

The commission responds that it did in fact consider cumulative effects while evaluating the plan amendment and that the scope and intensity of additional commercial uses are sufficiently limited by the guidelines in the plan amendment. In any event, the commission notes, the adaptive uses remain "subject to compliance with the applicable guidelines to protect scenic, cultural, natural and recreation resources."

Once again, we agree with the commission. Whether adverse effects will occur in violation of the Act is determined within the context of a "proposed action." Because petitioners allege that the commission's mitigation measures are unsatisfactory, which is a component of determining whether a proposed action will result in adverse effects to protected resources, presumably petitioners believe that the plan amendment itself is the "proposed action." However, the plan amendment does not approve any specific use of any particular historic property. Instead, it provides a framework within which applicants may obtain permission to commence an adaptive use of a historic property. The plan amendment requires that each applicant provide information about the proposed use and the historic property prior to obtaining approval. In addition, the plan amendment provides that, after each five years that the use continues, the application must be reevaluated for compliance with the management plan guidelines.

Petitioners have not met their burden to demonstrate that such a framework, on its face, violates the Act. If the commission, in the future, approves a use that is either inconsistent with its own guidelines or with the Act, petitioners could bring an as-applied challenge. It is not enough in a facial challenge to point to ways in which the plan amendment might be applied to violate the Act.

5. *Whether the plan amendment fails to protect cultural resources*

■ Finally, petitioners contend that the plan amendment violates the Act by failing to protect and enhance historic properties as cultural resources. As we have noted, one of the purposes of the Act is to protect and enhance the Scenic Area resources, including cultural resources. 16 USC § 544a(1). As we have also noted, in its plan amendment, the commission adopted a new cultural resources policy: "Provide incentives to protect and enhance historically significant buildings by allowing uses of such buildings that are compatible with their historic character and that provide public appreciation and enjoyment of them as cultural resources." Petitioners argue that the plan amendment does not accomplish that stated purpose for two reasons. First, petitioners assert, the plan amendment does not require that revenue generated from the adaptive uses be used to defray the costs of improving and maintaining the historic property. Second, according to petitioners, the plan amendment requires no correlation between the scope of an allowed adaptive use and the cost to improve and maintain that particular historic property.

The commission responds that, as part of each adaptive use application, applicants must demonstrate a link between the use and preservation of the historic property in the "Protection and Enhancement Plan" that is a required part of the application process. The commission also notes that the adaptive uses will be reviewed every five years for compliance with the relevant guidelines in the management plan. Those requirements, the commission contends, represent a reasonable interpretation of what the Act requires, which is therefore entitled to deference.

Again, petitioners' burden in this facial challenge is dispositive. Petitioners simply have failed to demonstrate that the plan amendment on its face affirmatively authorizes what the Act prohibits. Instead, petitioners argue that it violates the Act because there exist other provisions that could have been included in the plan amendment and that the plan

amendment might not accomplish its stated goal of protecting cultural resources. That is not enough to satisfy their burden of showing that the plan amendment, on its face, violates the Act.

Affirmed.