Argued and submitted October 21, 2008, at Burns High School, Burns, affirmed
May 13, 2009

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DEBRA ANGELINE SCHWARZ,
*Defendant-Appellant.*

Lake County Circuit Court
050035CR; A132505

208 P3d 971

Andrew S. Chilton argued the cause for appellant. On the brief were Patrick M. Ebbett and Chilton, Ebbett & Galli, LLC.

Katherine H. Waldo, Senior Assistant Attorney General, argued the cause for respondent. On the brief were Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Samuel A. Kubernick, Assistant Attorney General.

Before Landau, Presiding Judge, and Ortega, Judge, and Cramer, Judge pro tempore.

LANDAU, P. J.

## LANDAU, P. J.

Defendant was convicted of one count of criminal mistreatment in the first degree, ORS 163.205, after she brought her elderly husband to the courthouse when she appeared for sentencing on a probation violation and then left him there. Defendant sought a judgment of acquittal, asserting that the state had failed to establish that she "deserted" her husband with the intent to "abandon" him because there was no evidence that she intended to forsake him permanently. The trial court denied the motion, and defendant appeals. We affirm.

In reviewing the trial court's ruling, we state the facts, which are largely undisputed, in the light most favorable to the state, *State v. Brown*, 310 Or 347, 350, 800 P2d 259 (1990), for the purpose of determining whether the evidence is sufficient to allow a rational trier of fact to find the elements of the crime beyond a reasonable doubt, *State v. Allison*, 325 Or 585, 588, 941 P2d 1017 (1997).

Defendant, who lives in Texas, received a traffic citation while traveling through Lake County, Oregon. Apparently unhappy with the citation, she mailed her payment of the fine in an envelope containing feces. Based on that incident, she was later cited for, and convicted of, obstructing governmental administration, second-degree criminal mischief, and disorderly conduct. She was sentenced to a term of probation. Defendant, while on another trip to Oregon, violated the terms of her probation; she was cited for the violation and ordered to appear in court.

Defendant, who is in her 40s, was married to an 84-year-old man who suffers from dementia and incontinence. Defendant knew that she would likely be sentenced to jail time for her probation violation. Hoping that her husband's presence in the courtroom might influence the judge's decision on sentencing, she arranged for her Texas neighbor to send the victim to Oregon by bus. After a three-day bus ride from Texas, defendant's husband arrived in Lake County, but he had no idea why he had been sent to Oregon or that he would be attending a court hearing.

On the date of the hearing, defendant and her husband came to the courthouse in their pickup truck. At the start of the hearing, defendant told the court that her husband had no money and could not drive, and that he had his medication with him, along with four sets of clothes and one bag of adult diapers. Defendant informed the court that, if she received jail time, "somebody is going to have to take care of [her husband], and he's not going to a nursing home."

The prosecutor recommended jail time for defendant, but offered to delay the start of defendant's incarceration so that she could arrange for her husband's care. Defendant declined and told the court that she did not "give a rat's ass" whether the court sentenced her to 180 days in jail, but that, if she went to jail, the court or the county would have to take care of her husband. The court revoked defendant's probation and sentenced her to 180 days in jail. Deputy Sheriff Pore took defendant into custody.

After taking defendant to the jail, Pore returned to the courtroom and spoke with defendant's husband, who was distraught and confused and did not know what to do. It was clear to Pore that the husband could not take care of himself. Pore arranged for the husband to spend the night in a hospital and, over the next two days, attempted to make arrangements for his care. When Pore asked defendant what he should do with her husband, defendant replied that he could tell her husband to wait for her in their pickup truck.

The day after she was taken into custody, defendant continued to refuse to assist Pore in arranging for her husband's care, and Pore warned her that, if she remained unhelpful, he would arrest her for criminal mistreatment. She suggested that the judge could take care of her husband, who she said needed only to remain alive for seven more years, until her motor home was paid for. Ultimately, without any help from defendant, Pore arranged to return defendant's husband to Texas by bus, where a neighbor would care for him. (He died a few months later.)

After those events, a grand jury charged defendant with criminal mistreatment in the first degree under ORS 163.205(1)(b)(B), which provides, in part:

"A person commits the crime of criminal mistreatment in the first degree if:

"* * * * *

"(b)   The person, in violation of a legal duty to provide care for a dependent person or elderly person * * * intentionally or knowingly:

"* * * * *

"(B)   Deserts the dependent person or elderly person in a place with the intent to abandon that person[.]"

As relevant, the indictment alleged that defendant,

"[i]n violation of a legal duty to provide care for [the victim], an elderly person, did unlawfully and intentionally desert [the victim] in the Lake County Court House with the intent to abandon [the victim]."

The state's theory was that, by bringing the victim to the courthouse, knowing that she would likely be taken into custody, and by refusing to accept the prosecutor's offer to delay her incarceration or to assist Pore in arranging for the victim's care, defendant intentionally deserted her husband with an intent to abandon him.

On appeal, defendant contends that she did not "desert" her husband. In her view, the state proved only that she left him against her will in the custody of authorities who she knew—and even insisted—would take care of him. Further, she contends, her conduct evinces no intention to abandon her husband in the sense required by the statute "any more than a mother who is picked up on a warrant in her home deserts her children when she is taken off to jail." The state argues that, taking the evidence in the light most favorable to the state, the evidence is legally sufficient to show that defendant deserted her husband with the intent to abandon him.

The issue presented is one of statutory construction. Our goal in determining whether defendant deserted the victim within the meaning of ORS 163.205 is to ascertain the meaning most likely intended by the legislature, by examining its text in context and giving words of common usage their plain, natural, and ordinary meaning, unless context

makes clear that a different meaning was intended. *See PGE v. Bureau of Labor and Industries,* 317 Or 606, 611-12, 859 P2d 1143 (1993). The terms "desert" and "abandon" are not defined in ORS 163.205, and there are no cases interpreting them as they are used in that statute. We therefore refer to dictionary definitions for assistance in determining the ordinary meaning of the relevant terms. *State v. Holloway,* 138 Or App 260, 265, 908 P2d 324 (1995).

We begin with the meaning of the verb "desert." *Webster's Third New Int'l Dictionary* 610 (unabridged ed 2002), lists a number of different definitions for the verb in its transitive form, the form in which it is used in the statute, including "**1** : to withdraw from or leave permanently or less often temporarily (as a place) : quit * * * **2** * * * **b** : to leave behind or give up (as a person) * * * **4** : to drop away or escape from (a person) usu. causing a distinct sense of loss or discomfiture : leave in a lurch : FORSAKE[.]" Defendant emphasizes the first-listed definition, deriving from it the contention that "to desert" encompasses a notion of permanency. Defendant apparently presumes that the first definition listed in the dictionary is the primary definition. *Webster's,* however, does not list its definitions in order of preference; rather, it lists its definitions in order of historical usage. *Webster's* at 17a, note 12.5; *Friends of Columbia Gorge v. Columbia River,* 218 Or App 232, 245 n 2, 179 P3d 706, *rev allowed,* 345 Or 94 (2008). Deciding which among competing dictionary definitions applies to a given statute is not a matter of listed order, but a matter of how the word at issue is used in context. *State v. Stamper,* 197 Or App 413, 417, 106 P3d 172, *rev den,* 339 Or 230 (2005).

In this case, the first definition appears to us to be inapplicable, because it expressly pertains to desertion of *a place,* not a person. In contrast, the other two definitions that we have quoted relate to the desertion of a person, which seems more pertinent to the use of the term in the statute. Neither of those definitions necessarily includes an element of permanence in the act of deserting.

In context, the second of those two definitions appears to be the closest to the usage of the term in ORS 163.205. It seems unlikely that the legislature intended the

term "deserts" to mean "leaves," without more. One may "leave" a person in the competent care of others and, presumably, not violate the statute. Particularly in light of the statutory reference to deserting another "in violation of a duty to provide care," it seems clear to us that the term "deserts" is used in the sense of forsaking, "leav[ing] in a lurch" in a manner that deprives the one left of comfort or care. Nothing in that definition of the term necessitates that the forsaking or leaving is permanent, only that it deprives the left person of comfort or care.

The statute also requires that the defendant desert the victim "with an intent to abandon" the victim. Defendant argues that, if the word "deserts" does not require permanent departure, then the word "abandon" does. Once again, the statute contains no definition, and the dictionary provides a number from which to choose. Among those definitional choices are: "**1** : to cease to assert or exercise an interest, right, or title to esp. with the intent of never again resuming or reasserting it : YIELD, RELINQUISH * * * **3** : to forsake or desert esp. in spite of an allegiance, duty, or responsibility * * * : withdraw one's protection, support or help from[.]" *Webster's* at 2. Defendant again seizes on the first definition, arguing that it connotes permanent relinquishment. Again, however, the first definition, which refers to the relinquishment of "interest, right, or title," appears to relate to the abandonment of property. The latter definition, by contrast, more clearly pertains to an abandonment of a person and seems more relevant to the word as it is employed in the statute. That definition contains no suggestion that the abandonment must be permanent.

Defendant insists that, even if the ordinary meaning of the statutory terms does not require that the desertion or intent to abandon involve permanence, this court has read such a requirement into those terms, albeit in a different statute. For that assertion, defendant relies on our decision in *State v. Laemoa*, 20 Or App 516, 519-20, 533 P2d 370 (1975), a case in which this court construed the statute establishing the crime of child abandonment, ORS 163.535, which applies when a parent, guardian, or other person charged with the care or custody of a child "deserts the child in any place with intent to abandon it."

The particular issue in *Laemoa* was whether the child abandonment statute applied to a parent who relinquished her child to another for money. This court concluded that the statute did not apply because the parent did not "desert" the child within the meaning of that statute. It reached that conclusion for two reasons. First, the court noted that the legislative history—consisting primarily of a 1906 New York Court of Appeals decision construing the statute on which the Oregon statute was modeled—revealed that "desert[ion]" of a child within the meaning of the child abandonment statute was intended to refer only to conduct that "subject[s] the child to hazard of personal injury—such as may peril the life or health of the child." *Id.* at 526, 528. Second, the court noted that, given the fact that the statute defining the lesser offense of child neglect already required proof that the child was left in a place or for such a time as to endanger the health of the child, it necessarily followed that the greater offense required proof of at least that much, as well. The court held that, because the defendant left the child in a place "where she knew it was safe and protected," the state failed to prove its case. *Id.* at 529.

The court did list among the elements of the offense of child abandonment the requirement that the parent intend "to permanently forego all parental duties and to relinquish all parental claims to the child." *Id.* at 528. The court did not explain the source of that requirement. Nor did the court address whether the state had established proof of the requirement. At best, the statement was *dictum* about the requirements of a statute that the court emphasized involved the unique requirements of the child abandonment offense that the court determined from the legislative history of that statute. We decline to read that *dictum* as creating such an additional requirement in ORS 163.205.

Defendant also argues that, even if proof of intent to abandon permanently is not required, *Laemoa* requires that there be proof that the person who was deserted have been left in a place or for a time likely to endanger that person's life or health. As we have noted, this court did determine that such proof is required to establish a violation of the child abandonment statute. As we also have noted, however, that determination was expressly based on this court's reading of

the legislative history of the child abandonment statute and the fact that the context of that statute suggested that the legislature would have understood such a requirement to have been at least implicit. There is no such legislative history or contextual evidence of legislative intent suggesting that the legislature intended that the words in ORS 163.535 mean more than what they ordinarily mean.

We turn to the question whether the evidence was sufficient to permit the jury to find that defendant deserted her husband with an intent to abandon him. Defendant asserts that she did not desert the victim, because she did not leave him—she was taken from him against her will. It is true that defendant did not wish to be taken into custody. However, we reject defendant's attempt to analogize her circumstances to those of a person who is suddenly taken into custody without warning or the ability to arrange for the care of a dependent person. The evidence is undisputed that defendant knew that she likely would be incarcerated on her probation violation, and that she nonetheless brought the victim, an elderly person in need of care, to Oregon for the purpose of influencing the outcome of the hearing. A jury could find that, in transporting the victim to Oregon, defendant intentionally created a circumstance that would leave the victim without care in the likely event that defendant was taken into custody. Moreover, defendant chose to be taken into custody immediately after the hearing, rather than to delay her incarceration so as to arrange for the victim's care, as offered by the prosecutor. Finally, defendant refused to assist Pore in arranging for the victim's care after having placed him in circumstances that would likely require substitute care. That evidence was sufficient to permit the jury to find beyond a reasonable doubt that defendant left the victim in a place under circumstances causing him to be without care, with an intent to withdraw her protection and support for the victim, and thereby deserted him with an intent to abandon him.

Affirmed.